# THE JAPANESE IMMIGRANT CASE.[1]

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF WASHINGTON.

No. 171. Argued February 24, 1903.—Decided April 6, 1903.

1. As the existing treaty with Japan expressly excepts from its operation any regulation relating to police and public security, and as the various acts of Congress forbidding aliens of whatever country to enter the United States who are paupers or persons likely to become a public charge, are regulations for police and public security, aliens from Japan of the prohibited class have no right to enter or reside in the United States.

Quære, Whether, even in the absence of such a provision in the treaty, the "full liberty to enter, reside," etc., clause refers to that class in either country who from habits or conditions are the object of police regulations designed to protect the general public against contact with dangerous or improper persons.

2. It has been firmly established by numerous decisions of this court that it is within the constitutional power of Congress to exclude aliens of a particular race from the United States ; prescribe the terms and conditions upon which certain classes may come to this country; establish regulations for sending out of the country such aliens as come here in violation of law; and commit the enforcement of such provisions, conditions and regulations to executive officers, without judicial intervention.

3. An administrative officer, when executing the provisions of a statute involving the liberty of persons, may not disregard the fundamental principles of due process of law as understood at the time of the adoption of the Constitution. Nor is it competent for any executive officer, at any time within the year limited by the statute, to arbitrarily cause an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although illegally here, to be arrested and deported without giving such alien an opportunity, appropriate to the case, to be heard upon the questions involving his right to be and remain in the United States.

Where, however, the alien had notice, although not a formal one, the courts cannot interfere with the executive officers conducting it. The objections of the alien to the form of the investigation could have been presented to the officer having primary control of the case, or by an appeal to the Secretary of the Treasury, and the action of the executive officers is not subject to judicial review.

---

[1] Docket title—*Yamataya* v. *Fisher.*

THIS case presents some questions arising under the act of Congress relating to the exclusion of certain classes of alien immigrants.

On the 11th day of July, 1901, appellant, a subject of Japan, landed at the port of Seattle, Washington; and on or about July 15, 1901, the appellee, an Immigrant Inspector of the United States, having instituted an investigation into the circumstances of her entering the United States, decided that she came here in violation of law, in that she was a pauper and a person likely to become a public charge—aliens of that class being excluded altogether from this country by the act of March 3, 1891, 26 Stat. 1084, c. 551.

The evidence obtained by the Inspector was transmitted to the Secretary of the Treasury, who, under date of July 23, 1901, issued a warrant addressed to the Immigrant Inspector at Seattle, reciting that the appellant had come into the United States contrary to the provisions of the above act of 1891, and ordering that she be taken into custody and returned to Japan at the expense of the vessel importing her.

The Inspector being about to execute this warrant, an application was presented in behalf of the appellant to the District Court of the United States for the District of Washington, Northern Division, for a writ of *habeas corpus.* The application alleged that the imprisonment of the petitioner was unlawful, and that she did not come here in violation of the act of 1891 or of any other law of the United States relating to the exclusion of aliens.

The writ having been issued, a return was made by the Inspector stating that he had found upon due investigation and the admissions of the appellant that she was a pauper and a person likely to become a pubic charge, and had "surreptitiously, clandestinely, unlawfully and without any authority, come into the United States;" that "in pursuance of said testimony, admissions of the petitioner, Kaoru Yamataya, evidence, facts and circumstances," he had decided that she had no right to be within the territory of the United States and was a proper person for deportation; all which he reported to the proper officers of the Government, who confirmed his decision,

and thereupon the Secretary of the Treasury issued his warrant requiring the deportation of the appellant. That warrant was produced and made part of the return.

The return of the Inspector was traversed, the traverse admitting that the Inspector had investigated the case of the petitioner and had made a finding that she had illegally come into this country, but alleging that the investigation was a "pretended" and an inadequate one; that she did not understand the English language and did not know at the time that such investigation was with a view to her deportation from the country; and that the investigation was carried on without her having the assistance of counsel or friends or an opportunity to show that she was not a pauper or likely to become a public charge. The traverse alleged that the petitioner was not in the United States in violation of law.

A demurrer to the traverse was sustained, the writ of *habeas corpus* was dismissed, and the appellant was remanded to the custody of the Inspector. From that order the present appeal was prosecuted.

*Mr. Vere Goldthwaite*, with whom *Mr. Harold Preston* and *Mr. Walter A. Keene* were on the brief, for the appellant.

This appeal raises the question of the constitutionality of the act of March 3, 1891, in relation to immigration and the importation of aliens under contract or agreement to perform labor, 26 Stat. 1084, and also involves the application of the Fifth Amendment to the Constitution of the United States to the facts presented by the record.

We contend : 1. The provisions of the act of 1891 giving to inspection officers plenary power over the classes of aliens therein referred to, should be construed to extend only to aliens who have not effected an entrance into the United States. 2. The act of 1891 is unconstitutional. 3. Appellant is being deprived of her liberty without due process of law.

I. The lower court followed *United States* v. *Yamasaka,* 100 Fed. Rep. 404, but the facts in the case at bar clearly distinguish it therefrom. It is not necessary for us on this appeal to go so far as to contend that the Constitution requires that

an alien shall have a " judicial trial before a *court*" before he may be deported ; but the question here presented is whether an alien who does not belong to any of the prohibited classes, who has lawfully entered the United States and is entitled to remain therein, may be arrested by a ministerial officer and deported, without notice of any investigation against him or opportunity to be heard in any form of proceeding whatsoever.

Is it not entirely clear from the plain reading of this statute that Congress intended to make a distinction between aliens who had not and those who had effected a landing in the United States ? If no such distinction was intended, why did Congress use language which has and can be given no other meaning?

While a Japanese subject remains on board a Japanese vessel he is, in contemplation of law, on Japanese territory. When he lands on American soil he is subject to our laws and entitled to the protection of our Constitution. The word " person " as used in the Constitution includes aliens as well as citizens. *Re Ah Fong*, 3 Sawyer, 144 ; *Re Parrott*, 1 Fed. Rep. 481 ; *Ho Ah Kow* v. *Nunan*, 5 Sawyer, 552 ; *Fong Yue Ting* v. *United States*, 149 U. S. 698.

Under the treaty between the United States and Japan, November 22, 1894, and sec. 1977, Rev. Stat., when an alien of Japan effects a landing and is found dwelling in this country, he has, so far as concerns his life and liberty, all the rights of an American citizen. In recognition of this fact, Congress, when giving certain arbitrary powers to inspection officers, limited the exercise of these powers to the case of aliens who had not effected a landing.

II. The act of 1891, above referred to, is unconstitutional, in that it operates to deprive appellant of her liberty without due process of law.

While it may be difficult, if not impossible, to frame a definition of due process of law, it is nevertheless easy to point out certain requisites which must always be found in order to constitute due process of law, and foremost among these is the requirement that a person shall have notice and an opportunity to be heard in any proceeding affecting his rights. *Holden* v. *Hardy*, 169 U. S. 366 ; *Greene* v. *Briggs*, 1 Curtis, 311 ; *Scott*

v. *Toledo*, 36 Fed. Rep. 385; *Railroad Tax Cases*, 13 Fed. Rep. 722; *Myers* v. *Shields*, 61 Fed. Rep. 713; *Railway Co.* v. *Iowa*, 160 U. S. 389; *Hovey* v. *Elliott*, 167 U. S. 409; *Mc Veigh* v. *United States*, 11 Wall. 259; *Charles* v. *City of Marion*, 98 Fed. Rep. 166; *Stuart* v. *Palmer*, 74 N. Y. 183; 2 Kent's Comm. 13; *Hagar* v. *Reclamation District*, 111 U. S. 708.

It is useless to multiply authorities upon this proposition; but we content ourselves with the statement that in the wilderness of authority upon this subject not one case can be found holding that where a person's liberty is involved notice and an opportunity to be heard is not necessary in order to constitute due process of law.

As the act of 1891 fails to provide for the giving of notice to or an opportunity to be heard by the persons whose right to liberty are thereby affected, the same is, therefore, unconstitutional and void.

III. Whatever may be the ruling of this court as to the constitutionality of the act of 1891, it is contended by appellant that she is, as appears by the record, being deprived of her liberty in violation of the Fifth Amendment to the Constitution of the United States, in that she was not given any notice or opportunity to be heard in the proceeding in which her right to liberty was tried. The authorities hereinbefore cited sustain this contention. Here is a person found dwelling within the United States; she is arrested and imprisoned by a ministerial officer; she is not permitted to see her friends or to consult with her attorneys; she is unable to speak or understand our language, and is ignorant of the cause of her imprisonment, and ignorant of the fact that any investigation is being made concerning her right to liberty. The officer does not give her any notice of the proceedings nor any opportunity to be heard, but goes about secretly collecting evidence against her, considering only such evidence as when unexplained, will suit his purpose. He takes advantage of her ignorance of our language 'and makes her give unintentional answers to questions which she does not understand. He states that he is holding her to appear as a witness in a criminal case against another party, thus deceiving her attorneys as to his intention. As the

result of the investigation made by this ministerial officer in his combined capacity of prosecutor, judge and jury, he makes a finding against appellant. Thereafter he removes his decision to a higher tribunal, to wit, the Secretary of Immigration, and has it there affirmed. From here he takes another appeal to the Secretary of the Treasury and has his decision again affirmed, and a warrant of deportation issued. Of all these proceedings appellant is ignorant. A few hours before the sailing of the vessel upon which it was intended by respondent to deport her, it is by chance learned that such a step is contemplated. It is confidently asserted that our records will be searched in vain for authorities sustaining such a proceeding, and its only parallel must be sought for in the history of the times antedating *Magna Charta*. Will the highest court of the land hold this proceeding to be due process of law? It seems to us that to do so would be to strike a blow at the very foundation of free government. The appellant has, by treaty between our Government and the Empire of Japan, all the rights accorded by us to the citizens and subjects of the most favored nation. If respondent has the power which he has assumed to exercise with reference to appellant, then he may exercise the same power with reference to a citizen or subject of Great Britain, of Germany or of any other nation. By sec. 1977, Rev. Stat., as above stated, appellant has, so far as any questions involved in this appeal is concerned, the same rights as an American citizen. *Yick Wo* v. *Hopkins*, 118 U. S. 369.

It is pleaded that appellant failed to prosecute any appeal from the decision of appellee, and is for that reason precluded from having such decision reviewed in any other manner, since the act provides that the decision of inspection officers touching the right of an alien to land shall be final unless appeal be taken to the Secretary of the Treasury.

It appears from the record not only that appellant was not given any notice of the proceedings taken against her, or any opportunity to be heard thereat, but that she had no knowledge whatever that an investigation had been conducted, that a finding had been made, or that the same had been carried to

the Secretary of the Treasury and there affirmed, until long after such steps had been taken and the Secretary had issued his warrant of deportation, and she was, within the space of a few hours' time, to be deported. Can it be urged before this court that under such circumstances appellant's only means of redress was by appeal to the Secretary of the Treasury after the Secretary had himself heard and decided the matter against her and issued his warrant of deportation, that by failing to appeal from a decision of which she had absolutely no knowledge, or means of knowledge, she is thereby forever deprived of her rights? It is believed that the only precedent which appellee can find for such a contention is that which history records of the ruler who posted his decrees so high that his subjects were unable to read them, yet enforced strict compliance therewith.

*Mr. Assistant Attorney General Hoyt* for the appellee.

The law provides (act of March 3, 1891, 26 Stat. 1084) that all paupers or persons likely to become a public charge shall be excluded from the United States. The law provides among other things for the inspection of alien immigrants upon their arrival; that all aliens who may unlawfully come into the United States shall be sent back on the vessel by which they arrive, if practicable; and that any alien who comes into the United States in violation of law may be returned at any time within a year. In the present case the girl came into the United States in violation of law if she was a pauper or likely to become a public charge, and so she was found to be by the inspector who investigated the case and whose decision, under the act of August 18, 1894, was final unless reversed on appeal to the Secretary of the Treasury.

The general theory of *habeas corpus* submits only a naked question of law upon admitted facts. Necessarily, when the instance court takes such action as in this case, the meaning is that the official obedience to the law and orderly process sufficiently appear; that the action was with warrant of law, leaving the mere naked question of constitutionality; and therefore that the counter allegations or matters of confession and avoid-

ance have been regarded by the instance court as untrue, or not sufficiently appearing, or immaterial.

The present case was necessarily ruled below by the *Yamasaka* case, 100 Fed. Rep. 404. That decision held flatly that an alien landing surreptitiously may, within a year, be arrested and deported by the Secretary of the Treasury without judicial proceeding before a court. Counsel does not demand a *court*, but makes the old plea, familiar in all such cases, that here was an arbitrary arrest by a ministerial officer, and deportation without notice, hearing or due and just investigation. But the ministerial officer has been clothed with authority to determine and act, and this court has, in numerous cases, decided that the executive determination is final. *Nishimura Ekiu* v. *United States*, 142 U. S. 651; *Fong Yue Ting* v. *United States*, 149 U. S. 698; *Lem Moon Sing* v. *United States*, 158 U. S. 538; *Wong Wing* v. *United States*, 163 U. S. 228; *Fok Yung Yo* v. *United States*, 185 U. S. 296. Where the charge is that of delusive investigation and unfair and arbitrary decision, the court will not interfere. The presumption is that the result is proper. *Lee Lung* v. *Patterson*, 186 U. S. 193.

The act of 1891 does not deprive persons of life, liberty or property without due process of law. Congress has the right to expel as well as to exclude aliens. Deportation merely enforces the withholding of the privilege of coming or remaining here, which Congress has denied in its sovereign capacity for reasons of policy, founded in national self-protection.

The authorities cited by counsel are wholly inapplicable. They relate to taxing laws, property rights, state charges, and assessments of various kinds, without due notice and proceedings. The court has held time and again that the executive proceeding in these cases is due process of law, and that the exclusion and expulsion of aliens are the exercise of constitutional power. *Nishimura Ekiu* v. *United States*, 142 U. S. 651. Judicial statements as to property and liberty under entirely different circumstances do not remotely affect the present case. So long as the national policy and law as to immigration stand, there is no reason for opposing argument.

The treaty with Japan of 1894, Art. I, 29 Stat. 848, is nec-

essarily subject to the special exceptions and qualifications of our immigration laws relative to excluded classes of aliens.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

It will conduce to a clear understanding of the questions to be determined if we recall certain legislation of Congress relating to the exclusion of aliens from the United States, and to the treaty of 1894 between Japan and the United States.

By the Deficiency Appropriation Act of October 19, 1888, c. 1210, it was provided that the act of February 23, 1887, c. 220, amendatory of the act prohibiting the importation and immigration of foreigners and aliens under contract or agreement to perform labor in the United States, its Territories, and the District of Columbia, 24 Stat. 414, be so amended "as to authorize the Secretary of the Treasury, in case he shall be satisfied that an immigrant has been allowed to land contrary to the prohibition of that law, to cause such immigrant within period of one year after landing or entry, to be taken into custody and returned to the country from whence he came, at the expense of the owner of the importing vessel, or, if he entered from an adjoining country, at the expense of the person previously contracting for the services." 25 Stat. 566.

By the first section of the act of Congress of March 3, 1891, c. 551, amendatory of the various acts relating to immigration and importation of aliens under contract or agreement to perform labor, it was provided: "That the following classes of aliens shall be excluded from admission into the United States, in accordance with the existing acts regulating immigration, other than those concerning Chinese laborers: All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease, persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another or who is assisted by others to come, unless it is affirmatively and satisfactorily shown on

special inquiry that such person does not belong to one of the foregoing excluded classes, or to the class of contract laborers excluded by the act of February twenty-sixth, eighteen hundred and eighty-five, (23 Stat. 332.) . . . " 26 Stat. 1084.

By the eighth section of that act it was provided: "That upon the arrival by water at any place within the United States of any alien immigrants it shall be the duty of the commanding officer and the agents of the steam or sailing vessel by which they came to report the name, nationality, last residence, and destination of every such alien, before any of them are landed, to the proper inspection officers, who shall thereupon go or send competent assistants on board such vessel and there inspect all such aliens, or the inspection officers may order a temporary removal of such aliens for examination at a designated time and place, and then and there detain them until a thorough inspection is made. . . . The inspection officers and their assistants shall have power to administer oaths, and to take and consider testimony touching the right of any such aliens to enter the United States, all of which shall be entered of record. During such inspection after temporary removal the superintendent shall cause such aliens to be properly housed, fed, and cared for, and also, in his discretion, such as are delayed in proceeding to their destination after inspection. All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury. It shall be the duty of the aforesaid officers and agents of such vessel to adopt due precautions to prevent the landing of any alien immigrant at any place or time other than that designated by the inspection officers, and any such officer or agent or person in charge of such vessel who shall either knowingly or negligently land or permit to land any alien immigrant at any place or time other than that designated by the inspection officers, shall be deemed guilty of a misdemeanor and punished by a fine not exceeding one thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment. . . ." 26 Stat. 1085,

By the tenth section it is provided that "all aliens who may unlawfully come to the United States shall, if practicable, be immediately sent back on the vessel by which they were brought in."

The eleventh section of the same act provided : " That any alien who shall come into the United States in violation of law may be returned as by law provided, at any time within one year thereafter, at the expense of the person or persons, vessel, transportation company, or corporation bringing such alien into the United States, and if that cannot be done, then at the expense of the United States; and any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing therein shall be deemed to have come in violation of law and shall be returned as aforesaid."    26 Stat. 1084.

In the Sundry Civil Appropriation Act of August 18, 1894, c. 301, was the following provision : " In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of the Treasury."    28 Stat. 372, 390.

Then came the treaty between the United States and the Empire of Japan, concluded November 23, 1894, and proclaimed March 21, 1895, and which by its terms was to go into operation July 17, 1899.   By the first article of that treaty it was provided : " The citizens or subjects of each of the two high contracting parties shall have full liberty to enter, travel or reside in any part of the territories of the other contracting party, and shall enjoy full and perfect protection for their persons and property."   29 Stat. 848.   But by the second article it was declared : " It is, however, understood that the stipulations contained in this and the preceding article do not in any way affect the laws, ordinances and regulations with regard to trade, the immigration of laborers, police and public security which are in force or which may hereafter be enacted in either of the two countries."   29 Stat. 849.

1. From the above acts of Congress it appears that among

the aliens forbidden to enter the United States are those, of whatever country, who are "paupers or persons likely to become a public charge." We are of opinion that aliens of that class have not been given by the treaty with Japan full liberty to enter or reside in the United States; for that instrument expressly excepts from its operation any ordinance or regulation relating to "police and public security." A statute excluding paupers or persons likely to become a public charge is manifestly one of police and public security. Aside from that specific exception, we should not be inclined to hold that the provision in the treaty with Japan that the citizens or subjects of each of the two countries should have "full liberty to enter, travel or reside in any part of the territories of the other contracting party," has any reference to that class, in either country, who from their habits or condition are ordinarily or properly the object of police regulations designed to protect the general public against contact with dangerous or improper persons.

2. The constitutionality of the legislation in question, in its general aspects, is no longer open to discussion in this court. That Congress may exclude aliens of a particular race from the United States; prescribe the terms and conditions upon which certain classes of aliens may come to this country; establish regulations for sending out of the country such aliens as come here in violation of law; and commit the enforcement of such provisions, conditions and regulations exclusively to executive officers, without judicial intervention, are principles firmly established by the decisions of this court. *Nishimura Ekiu* v. *United States*, 142 U. S. 651; *Fong Yue Ting* v. *United States*, 149 U. S. 698; *Lem Moon Sing* v. *United States*, 158 U. S. 538; *Wong Wing* v. *United States*, 163 U. S. 228; *Fok Yung Yo* v. *United States*, 185 U. S. 296, 305.

In *Nishimura's* case the court said: "The supervision of the admission of aliens into the United States may be entrusted by Congress either to the Department of State, having the general management of foreign relations, or to the Department of the Treasury, charged with the enforcement of the laws regulating foreign commerce; and Congress has often passed

acts forbidding the immigration of particular classes of foreigners, and has committed the execution of these acts to the Secretary of the Treasury, to collectors of customs and to inspectors acting under their authority." After observing that Congress, if it saw fit, could authorize the courts to investigate and ascertain the facts on which depended the right of the alien to land, this court proceeded : " But, on the other hand, the final determination of those facts may be entrusted by Congress to executive officers ; and in such a case, as in all others, in which a statute gives a discretionary power to an officer, to be exercised by him upon his own opinion of certain facts, he is made the sole and exclusive judge of the existence of those facts, and no other tribunal, unless expressly authorized by law to do so, is at liberty to reëxamine or controvert the sufficiency of the evidence on which he acted. *Martin* v. *Mott*, 12 Wheat. 19, 31 ; *Philadelphia & Trenton Railroad* v. *Stimpson*, 14 Pet. 448, 458 ; *Benson* v. *McMahon*, 127 U. S. 457 ; *In re Oteiza*, 136 U. S. 330. It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the National Government. As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law. *Murray* v. *Hoboken Co.*, 18 How. 272 ; *Hilton* v. *Merritt*, 110 U. S. 97."

In *Lem Moon Sing's* case it was said : " The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications." And in *Fok Yung Yo's* case, the latest one in this court, it was said : " Congressional action has placed the final determination of the right of admission in executive officers, without judicial

intervention, and this has been for many years the recognized and declared policy of the country."

What was the extent of the authority of the executive officers of the Government over the petitioner after she landed? As has been seen, the Secretary of the Treasury, under the above act of October 19, 1888, c. 1210, was authorized, within one year after an alien of the excluded class entered the country, to cause him to be taken into custody and returned to the country whence he came. Substantially the same power was conferred by the act of March 3, 1891, c. 551, by the eleventh section of which it is provided that the alien immigrant may be sent out of the country, "as provided by law," at any time within the year after his illegally coming into the United States. Taking all its enactments together, it is clear that Congress did not intend that the mere admission of an alien, or his mere entering the country, should place him at all times thereafter entirely beyond the control or authority of the executive officers of the Government. On the contrary, if the Secretary of the Treasury became satisfied that the immigrant had been allowed to land contrary to the prohibition of that law, then he could at any time within a year after the landing cause the immigrant to be taken into custody and deported. The immigrant must be taken to have entered subject to the condition that he might be sent out of the country by order of the proper executive officer if within a year he was found to have been wrongfully admitted into or had illegally entered the United States. These were substantially the views expressed by the Circuit Court of Appeals for the Ninth Circuit in *United States* v. *Yamasaka*, 100 Fed. Rep. 404.

It is contended, however, that in respect of an alien who has already landed it is consistent with the acts of Congress that he may be deported without previous notice of any purpose to deport him, and without any opportunity on his part to show by competent evidence before the executive officers charged with the execution of the acts of Congress, that he is not here in violation of law; that the deportation of an alien without provision for such a notice and for an opportunity to be heard

was inconsistent with the due process of law required by the Fifth Amendment of the Constitution.

Leaving on one side the question whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, and who has been here for too brief a period to have become, in any real sense, a part of our population, before his right to remain is disputed, we have to say that the rigid construction of the acts of Congress suggested by the appellant are not justified. Those acts do not necessarily exclude opportunity to the immigrant to be heard, when such opportunity is of right. It was held in *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 280, 281, 283, that " though ' due process of law ' generally implies and includes *actor, reus, judex,* regular allegations, opportunity to answer and a trial according to some course of judicial proceedings, yet this is not universally true;" and that " though, generally, both public and private wrong are redressed through judicial action, there are more summary extra-judicial remedies for both." Hence, it was decided in that case to be consistent with due process of law for Congress to provide summary means to compel revenue officers—and in case of default, their sureties—to pay such balances of the public money as might be in their hands. Now, it has been settled that the power to exclude or expel aliens belonged to the political department of the Government, and that the order of an executive officer, invested with the power to determine finally the facts upon which an alien's right to enter this country, or remain in it, depended, was " due process of law, and no other tribunal, unless expressly authorized by law to do so, was at liberty to reëxamine the evidence on which he acted, or to controvert its sufficiency." *Fong Yue Ting* v. *United States*, 149 U. S. 698, 713 ; *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 659 ; *Lem Moon Sing* v. *United States*, 158 U. S. 538, 547. But this court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in " due process of law " as understood at the time of the adoption of the Constitution.

One of these principles is that no person shall be deprived of his liberty without opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends—not necessarily an opportunity upon a regular, set occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time be appropriate to the nature of the case upon which such officers are required to act.   Therefore, it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States.   No such arbitrary power can exist where the principles involved in due process of law are recognized.

This is the reasonable construction of the acts of Congress here in question, and they need not be otherwise interpreted. In the case of all acts of Congress, such interpretation ought to be adopted as, without doing violence to the import of the words used, will bring them into harmony with the Constitution.   An act of Congress must be taken to be constitutional unless the contrary plainly and palpably appears.   The words here used do not require an interpretation that would invest executive or administrative officers with the absolute, arbitrary power implied in the contention of the appellant.   Besides, the record now before us shows that the appellant had notice, although not a formal one, of the investigation instituted for the purpose of ascertaining whether she was illegally in this country.   The traverse to the return made by the Immigration Inspector shows upon its face that she was before that officer pending the investigation of her right to be in the United States, and made answers to questions propounded to her.   It is true that she pleads a want of knowledge of our language; that she did not understand the nature and import of the questions propounded to her; that the investigation made was a

" pretended " one ; and that she did not, at the time, know that the investigation had reference to her being deported from the country. These considerations cannot justify the intervention of the courts. They could have been presented to the officer having primary control of such a case, as well as upon an appeal to the Secretary of the Treasury, who had power to order another investigation if that course was demanded by. law or by the ends of justice. It is not to be assumed that either would have refused a second or fuller investigation, if a proper application and showing for one had been made by or for the appellant. Whether further investigation should have been ordered was for the officers, charged with the execution of the statutes, to determine. Their action in that regard is not subject to judicial review. Suffice it to say, it does not appear that appellant was denied an opportunity to be heard. And as no appeal was taken to the Secretary from the decision of the Immigration Inspector, that decision was final and conclusive. If the appellant's want of knowledge of the English language put her at some disadvantage in the investigation conducted by that officer, that was her misfortune, and constitutes no reason, under the acts of Congress, or under any rule of law, for the intervention of the court by *habeas corpus*. We perceive no ground for such intervention—none for the contention that due process of law was denied to appellant.

The judgment is

*Affirmed.*

Mr. Justice Brewer and Mr. Justice Peckham dissented.