FRANK WATERHOUSE & CO., Inc., et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 17, 1908.)

No. 1,460.

1. ALIENS—DEPORTATION—REFUSAL OF MASTER OF IMPORTING VESSEL—STATUTES.

Where an alien deserted from the vessel on which he was brought to the United States, but there was no evidence that he was either insane, epileptic, a pauper, or a person likely to become a public charge when the vessel arrived in port, or at any other time when he was on board, nor until a month later, when he was arrested, and when he first gave evidence of insanity, the master was not chargeable with bringing an alien not entitled to land into the United States, under Exclusion Act March 3, 1903, c. 1012, § 2, 32 Stat. p. 1214, excluding idiots, insane persons, epileptics, paupers, and persons likely to become a public charge.

2. SAME—DESERTION—EFFECT.

Where an alien lawfully came into the country as a member of the crew of a foreign vessel, his subsequent desertion of the vessel did not make his arrival unlawful, unless such desertion was permitted or in some way aided or connived at by an officer or agent of the vessel.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 2, Aliens, § 114.]

3. SAME—ESCAPE FROM VESSEL.

Where there was no evidence that any one connected with a vessel from which an alien escaped into the United States permitted or in any way connived at the alien's desertion, neither the master nor the agents of the vessel were guilty of an offense under Exclusion Act March 3, 1903, c. 1012, § 18, 32 Stat. p. 1217, requiring the owners, officers, and agents of vessels bringing any alien to the United States to adopt precautions to prevent their landing at any other time or place than those designated

by the immigration officers, and declaring that any such owner, agent, or person in charge of the vessel, permitting any alien to land contrary to such regulations, shall be guilty of a misdemeanor.

4. SAME—DEPORTATION—FINALTY OF DECISION.

The direction of the Secretary of Commerce and Labor that an alien should be deported on defendant's vessel, by which he was brought to the United States, was not conclusive on the officers and agents of the vessel, neither of whom had been a party to the proceedings before the Secretary.

5. CONSTITUTIONAL LAW—DUE PROCESS OF LAW—DEPORTATION OF ALIEN—RIGHT TO HEARING.

Where an alien had deserted from the crew of a vessel from which he was brought into the United States, and had been at large in the country for a month before he developed insanity, when he was arrested and ordered deported by the Secretary of Commerce and Labor, the Secretary's decision was not conclusive on the alien; the Secretary, as an executive officer, being without power within the year limited by statute to order the deportation of an alien without giving him an opportunity to be heard on the questions involving his right to remain in the United States.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington.

Action on the part of the United States to recover penalties for refusal to return an alien to the country from which he came, under Act March 3, 1903, c. 1012. § 19, 32 Stat. p. 1218. The British ship Olivebank arrived at Port Townsend, in the state of Washington, on the 28th day of October, 1906. Among the crew on board this vessel was a boy named William Schmitz, who had shipped on board the vessel at Hamburg, Germany. The voyage of the vessel, as shown by the shipping articles, was from Hamburg, Germany, to Tacoma, on Puget Sound, and thence to any port or ports, and to terminate in the United Kingdom or the continent of Europe within the limits of 75 degrees north and 65 degrees south latitude, the maximum time of the voyage to be three years. The boy, Schmitz, signed as a member of the crew for the voyage, and was designated on the articles as a deck boy. The vessel having arrived at Port Townsend, the crew was inspected by Dr. Lyle, Acting Assistant Surgeon of the Marine Hospital Service. Schmitz was a member of the crew at that time, and the surgeon found him apparently sound mentally and physically. The vessel proceeded to Seattle, and on the night of October 30th Schmitz deserted. This fact was reported by the master to the British consul at Seattle. On November 30th Schmitz was arrested at Aberdeen, in the state of Washington, and taken to Port Townsend. Dr. Lyle again saw him on December 4th and found him in a nervous and excited condition. The doctor saw Schmitz again on December 7th. In the afternoon of that day Schmitz was very much excited, and in the evening he had an acute attack of mania. On December 9th Schmitz was removed to Seattle on account of his insane condition. Thereafter he was removed to the insane asylum at Steilacoom. The immigrant inspector at Seattle, on a warrant issued by the Secretary of Commerce and Labor, notified the officers of the Olivebank and Frank Waterhouse & Co., the agent of the vessel at Seattle, to return Schmitz to the country from which he came. This they refused to do.

A complaint was thereupon filed in the United States District Court at Seattle by the United States Attorney, charging, in substance, that Frank Waterhouse & Co. and John Doe (the master) did, on the 18th day of December, 1906, knowingly, unlawfully, and willfully bring into the United States at the port of Port Townsend, by water, upon the vessel Olivebank, from a foreign port and place, to wit, from the port of Hamburg, Germany, an alien by the name of William Schmitz, he, the said William Schmitz, being an insane person and epileptic, and being then and there a pauper and liable to become a public charge, which facts were then and there, during all the times mentioned in the information, well known to said Frank Waterhouse & Co. and said John Doe, the master of said vessel; that the Secretary of Commerce and Labor had ordered, directed, and decided that the said William Schmitz should return to the country from whence he came, and that he was not en-

titled to land or remain in the United States; that the said William Schmitz should be deported by the vessel, and by the owners, agents, and master thereof, upon which the said William Schmitz arrived in the United States; that the said Frank Waterhouse & Co. and the said John Doe, master of said vessel, had refused to deport the said William Schmitz, and refused to take him upon board of said vessel for any purpose whatsoever, and had refused and declined to take, receive, or deport the said William Schmitz from the United States to the port of Hamburg, Germany, and had refused to take the said William Schmitz from the United States to any foreign port or place. James Carse appeared as the master of the vessel, and his name became substituted for that of John Doe as representing the vessel, together with Frank Waterhouse, representing Frank Waterhouse & Co., the agent of the vessel. By stipulation of counsel on both sides the case was tried by the court without a jury. The court found the defendants guilty, as charged in the information, for violation of section 19 of the Act of March 3, 1903 (32 Stat. p. 1218, c. 1012), and defendants were then fined in the sum of $300 and costs. The case has been brought here upon writ of error.

W. H. Bogle, Thomas B. Harden and Charles P. Spooner, for plaintiff in error.

Potter Charles Sullivan, U. S. Atty., and Henry M. Hoyt and Charles T. Hutson, Asst. U. S. Attys.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The statute relating to the immigration of aliens in force when the proceedings were had in this case was the act of March 3, 1903 (32 Stat. pp. 1213, 1214, c. 1012). Section 2 of that act provided that:

"The following classes of aliens shall be excluded from admission into the United States: All idiots, insane persons, epileptics, * * * paupers; persons likely to become a public charge."

Section 19 provided:

"That all aliens brought into this country in violation of law shall, if practicable, be immediately sent back to the countries whence they respectively came on the vessels bringing them. * * * And if any master, person in charge, agent, owner, or consignee of any such vessels, shall refuse to receive back on board thereof, or of any other vessel owned by the same interest, such alien * * * or shall refuse or neglect to return them to the foreign port from which they came, * * * such master, person in charge, agent, owner, or consignee, shall be deemed guilty of a misdemeanor and shall, on conviction, be punished by a fine not less than three hundred dollars for each and every such offense."

The complaint filed by the United States attorney against the defendants in this case was based upon these two sections of the statute; but there was no testimony tending to show that the boy, Schmitz, was either insane, an epileptic, or a pauper, or a person likely to become a public charge, when the vessel arrived at Port Townsend, or at any other time while he was on board the vessel. It was not until a month later, when he was arrested at Aberdeen, that he gave evidence of being insane. It cannot, therefore, be said that Schmitz was brought into this country in violation of section 2 of the act. He had a right to come as a member of the crew of the vessel on which he had shipped, and, having passed the quarantine inspection, he was entitled to proceed with the vessel to Seattle. Up to the time of his desertion from the vessel at Seattle on October 30th his presence in the United States

was, therefore, lawful. His desertion from the vessel did not make his arriving here unlawful, unless such desertion was permitted, or in some way aided or connived at, by an officer or agent of the vessel.

Section 18 of the act provided:

"That it shall be the duty of the owners, officers and agents of any vessel bringing an alien to the United States to adopt due precautions to prevent the landing of any such alien from such vessel at any time or place other than that designated by the immigration officers; and any such owner, officer, agent, or person in charge of such vessel who shall land or permit to land any alien at any time or place other than that designated by the immigration officer, shall be deemed guilty of a misdemeanor, and shall on conviction be punished," etc. " * * * And every such alien so landed shall be deemed to be unlawfully in the United States and shall be deported as provided by law."

The defendants were not charged in the complaint with any violation of this section, nor did the evidence tend in any degree to show that the master or any officer of the vessel, or the agent or any one connected with the vessel, permitted or in any way connived at Schmitz's desertion. It cannot, therefore, be charged that he was in the United States in violation of section 18 of the act. Taylor v. U. S., 207 U. S. 120, 28 Sup. Ct. 53, 52 L. Ed. ——.

Section 20 of the act provided:

"That any alien who shall come into the United States in violation of law or who shall be found a public charge therein, from causes existing prior to landing, shall be deported as hereinafter provided to the country whence he came at any time within two years after arrival at the expense, including one-half the cost of the inland transportation to the port of deportation, of the person bringing such alien into the United States, or, if that can not be done, then at the expense of the immigrant fund referred to in section 1 of this act."

Defendants were not charged in the complaint with any violation of this section. There was, however, an effort made to prove that Schmitz's insanity arose from causes existing prior to the landing; but the effort failed, and there is no evidence in the record tending to prove a liability under this section of the act.

There is a suggestion in the argument of counsel that the decision of the Secretary of Commerce and Labor deporting Schmitz on the vessel which brought him into the United States was final. It is alleged in the complaint that the Secretary of Commerce and Labor had ordered, directed, and decided that Schmitz should be returned to the country from whence he came, that he was not entitled to land or remain in the United States, and that he should be deported by the vessel upon which he arrived in the United States. The only evidence in support of this allegation was a statement in the testimony of C. A. Turner, the immigrant inspector at Seattle to the effect that:

"After the arrest of this alien on the warrant of the Secretary of Commerce and Labor, * * * a written notice was served upon the ship's officers, and a written notice served upon Frank Waterhouse & Co."

This notice appears to have been a demand served upon the officers and agents of the vessel to take Schmitz back to the country from whence he came. We cannot, upon this evidence, determine what action the Secretary of Commerce and Labor took in this case; but, as-

suming that there was a decision by that officer that Schmitz should be so deported, the case is not one where such a decision would be final as against the defendants. Neither the officers nor the agents of the vessel appear to have been a party to the proceedings before the Secretary of Commerce and Labor. They were certainly entitled to a hearing before they could be adjudged guilty of violating the laws of the United States, and no action or decision of the Secretary of Commerce and Labor could finally determine the guilt or innocence of persons in a criminal proceeding wholly outside of his jurisdiction. But even with respect to Schmitz such decision would not be final. He had entered the country, and for a month was a part of its population and subject to its jurisdiction. In the Japanese Immigrant Case, 189 U. S. 86, 100, 23 Sup. Ct. 611, 614, 47 L. Ed. 721, the Supreme Court of the United States said:

"But this court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution. One of these principles is that no person shall be deprived of his liberty without opportunity at some time to be heard before such officers in respect of the matters upon which that liberty depends—not necessarily an opportunity upon a regular, set occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time he appropriated to the nature of the case upon which such officers are required to act. Therefore it is not competent for the Secretary of the Treasury, or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country and has become subject in all respects to its jurisdiction and a part of its population, although alleged to be illegally here, to be taken into custody and deported, without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States. No such arbitrary power can exist where the principles involved in due process of law are recognized."

See, also, Hopkins v. Fachant (in this court) 130 Fed. 839, 65 C. C. A. 1.

The judgment of the District Court is reversed.