EDDY GOSSCHALK, PLAINTIFF-RESPONDENT, v. FRANCISKA JOKL GOSSCHALK, DEFENDANT-APPELLANT.

Argued September 22, 1958—Decided October 20, 1958.

*Mr. Samuel A. Bloom* argued the cause for the appellant.

*Mr. Nicholas S. Schloeder* argued the cause for respondent.

PER CURIAM. The judgment is affirmed for the reasons expressed in the opinion of Judge Schettino in the court below.

FRANCIS, J. (dissenting). I dissent from the determination of the majority upon two grounds: (1) at the time this suit was instituted, the plaintiff did not have the necessary domiciliary qualifications and consequently the

Superior Court was without jurisdiction; and (2) even assuming that jurisdiction did exist, the refusal of the court to stay the trial for a reasonble period to permit the disposition of the matrimonial action already pending in Holland, constituted a mistaken use of discretion.

## I.

### ABSENCE OF JURISDICTION.

The Superior Court had no jurisdiction to entertain plaintiff's suit for divorce unless he had been a *bona fide* resident of this State for two years prior to the filing of the complaint. *N. J. S.* 2*A*:34–10. Residence in this context signifies domicile, nothing less. *Voss v. Voss,* 5 *N. J.* 402 (1950). A person whose capacity for domicile is limited by law to that of a temporary sojourner cannot qualify as a divorce suitor in our courts.

Gosschalk, a Holland national, was granted an immigrant's visa on October 16, 1953. Under it for the first time he was "lawfully admitted for permanent residence" in this country. 8 *U. S. C. A.* § 1101(*a*)(17)(20). Concededly, thereafter his intention to remain here permanently gave him the right to establish a domicile. His complaint was filed on November 23, 1954, only 13 months later. So the court had no jurisdiction of his alleged cause of action unless his residence in New Jersey prior to that date can be added to make up the two-year requirement. The answer depends upon whether his sojourn under a visitor's visa permitted him to establish a domicile.

The majority accept the view of the Appellate Division that a domicile may be created by physical presence and the existence of *animus manendi* for the requisite period. But there is another element, namely, legal capacity to choose the domicile. 1 *Beale, The Conflict of Laws,* 108 (1935); *Minor, Conflict of Laws,* 109 (1901); 17*A Am. Jur., Domicil,* § 20, *pp.* 211–212; *cf. In re Collins' Estate,* 11 *N. J. Misc.* 233 (*Surr.* 1932); *Hess v. Kimble,* 79 *N. J. Eq.* 454 (*Ch.* 1911). If legal competence to do so

is not present, it matters not what the person's actual intention may be.

According to Gosschalk, in July 1950, while domiciled in Holland, he formed the desire to reside in the United States permanently. He had business interests here as well as in Holland. In furtherance thereof on July 17, 1950 he obtained a confirmation of his application for immigration to this country from the consulate office in Rotterdam. This simply denoted that he became listed as one of many persons who were seeking and awaiting authorized emigration.

In November 1950 he came here lawfully but on a visitor's visa. On a number of previous occasions he had occupied the same status and was aware of its significance. In order to obtain it, he had to establish:

(1) that he had a residence in Holland which he had no *intention* of abandoning;

(2) that he *intended* to remain in the United States temporarily;

(3) that he *intended in good faith* and would be able to depart at the expiration of the temporary stay;

(4) that he was in possession of a passport permitting him to return to the country of his residence;

(5) that he had made adequate financial provision to enable him to carry out the purpose of his travel and his sojourn, and his departure from the United States. 8 *U. S. C. A.* § 1101(*a*)(15)(*B*); *Besterman, Commentary on the Immigration and Nationality Act,* 8 *U. S. C. A.* §§ 1, 37.

There can be no doubt about the authority of Congress to specify these conditions. *Yamataya v. Fisher,* 189 *U. S.* 86, 97, 23 *S. Ct.* 611, 47 *L. Ed.* 721 (1903).

Gosschalk's visa was marked "Visitor's Permit" and said over his signature:

"The holder agrees to (1) depart from the United States at the expiration of stay authorized by the United States Immigration and Naturalization Service (2) surrender this document at time of departure."

In addition, his passports had stamped on them "Temporary visitor." At intervals thereafter he signed and swore to documents entitled "Application to Extend Time of Temporary Stay." They recited his foreign residence as "15 Raphaelplein, Amsterdam, The Netherlands," that he was admitted for a temporary period (stating it), that he came as a non-immigrant and that he was in possession of a return passage or ticket. In none of these applications did he give Weehawken as his mailing address; one in Flushing, Long Island, New York, was used. He remained in the United States (except for some trips abroad) under extensions of his visitor's visa until he was given immigrant status.

Certain of the administrative regulations adopted to implement the *Immigration and Nationality Act* are significant. Under 8 *C.F.R.* 214.2, 214.4 and 214b.1, an alien is admitted as a non-immigrant only upon condition that he will maintain the non-immigrant status; that he will depart from the United States within six months unless the time is extended, and that any extension shall continue to be subject to the same limitations.

These facts make it obvious that as a matter of law Gosschalk was here as a temporary visitor, and that he would not have been allowed in the country nor would he have been given extensions of the length of visit if he had professed the intention he now claims as to permanent residence. Assuming his veracity with respect thereto, the illegal intention, which must be considered in violation of the regulations of his allegedly adopted country and utterly inconsistent with the exercise of good faith in seeking entry as a visitor, should not entitle him to much relief in a court of equity. But the primary significance of his position is that he did not have the legal capacity to remain here permanently. So his intention with respect to domicile was incapable of fruition. Clothed in its most favorable legal raiment, it might be said that in effect he contemplated making his home here if and when he attained immigrant status (or perhaps became a lawful treaty trader under a treaty permitting permanent stay—to be discussed

later). In other words, a domicile would come into existence when he was free to choose it, *i. e.*, upon the happening of the condition. 17*A Am. Jur., Domicil, supra; Beale, supra,* § 20.2; *Minor, supra,* § 57; *cf. Sprague v. Sprague,* 131 *N. J. Eq.* 104, 107 (*E. & A.* 1942).

The Appellate Division predicated its opinion largely upon *Greiner v. Bank of Adelaide,* 176 *Misc.* 315, 26 *N. Y. S. 2d* 515 (*Sup. Ct. Sp. Term* 1941), *Townsend v. Townsend,* 176 *Misc.* 19, 26 *N. Y. S. 2d* 517 (*Sup. Ct. Sp. Term* 1941), and *Taubenfeld v. Taubenfeld,* 276 *App. Div.* 873, 93 *N. Y. S. 2d* 757 (*App. Div.* 1949), leave to appeal denied 276 *App. Div.* 918, 94 *N. Y. S. 2d* 827 (*App. Div.* 1950). These cases are neither persuasive nor decisive. The first two did involve visitors' visas. But they were decisions of the heart and not of the law. They cited no supporting authorities but premised the result on the unusual circumstances (which certainly are not present here). The circumstances were that the native lands of the plaintiffs were occupied by the Nazis and they could not return. In effect, they were granted asylum, and compassion manifestly played its part in the search for a base for recognition of residence. Note the comment in *Schwallbach v. Schwallbach,* 84 *N. Y. S. 2d* 345 (*Sup. Ct. Sp. Term* 1948), affirmed 276 *App. Div.* 825, 93 *N. Y. S. 2d* 716 (*App. Div.* 1949). In the *Taubenfeld* case, where the issue was presented on a preliminary motion for *pendenle lite* relief, it was said in a short and inconclusive memorandum that the matter of residence should not be determined on affidavits but reserved for trial; also that [276 *App. Div.* 873, 93 *N. Y. S. 2d* 759] "plaintiff may maintain this action, even though she is not domiciled in this State, because it affirmatively appears that she was actually sojourning or dwelling here at the time the offence was committed and when the action was commenced." A short dissent expressed the view espoused in this opinion, *i. e.*, "Mere presence in the jurisdiction is not sufficient, even when coupled with a wish or desire to remain there when such desire is thwarted by a legal disability." And the holding of these cases may be viewed also in the

light of the statement of the United States Supreme Court in *McGrath v. Kristensen*, 340 *U. S.* 162, 176, 71 *S. Ct.* 224, 232, 95 *L. Ed.* 173 (1950), which was delivered against a similar background:

"\* \* \* [W]e cannot conclude, without regulations so defining residence, that a sojourn within our borders made necessary by the conditions of the times was residence within the meaning of the statute."

Other cases on the federal scene throw some light upon our problem and lend support to a conclusion that Gosschalk should not be regarded as a person possessed of a *bona fide* domicile here. In *Sleddens v. Shaughnessy*, 177 *F.* 2d 363 (2 *Cir.* 1949), it appeared that Sleddens entered the United States with his family as a visitor on business and was given a visitor's permit for six months. After the expiration of an extension of the permit, deportation proceedings were brought against him on the ground that he had entered the country as an immigrant without an immigration visa. The proofs showed that prior to his entry Sleddens knew that he would be unable to obtain an immigration visa for three or four years; that he sought to come to America to establish a business enterprise; and that when he came here he had no intention of returning to his homeland. He testified that when he was given a visitor's permit, his intention was to remain here permanently, if possible. The court sustained the deportation order, holding that by entering as a visitor with a present intent to remain permanently if possible, he was an immigrant not in possession of a valid immigration visa.

*United States ex rel. Feretic v. Shaughnessy*, 221 *F.* 2d 262 (2 *Cir.* 1955), *certiorari* denied 350 *U. S.* 822, 76 *S. Ct.* 49, 100 *L. Ed.* 735 (1955), is of like import. There a seaman was admitted to this country as a non-immigrant under what is now 8 *U. S. C. A.* § 1101(a)(15)(D). His papers were in order as a *"bona fide* alien seaman" temporarily here and with the intention of departing at the expiration of his leave. The Second Circuit Court of Appeals said:

"In reality, however, his own unequivocal testimony compels a finding that when he left the ship he intended to stay here permanently if he could. Under these circumstances, we have no doubt that his entry was illegal. In effect he perpetrated a fraud upon the immigration authorities when he induced them to let him off the ship on the basis of the usual papers presented by *bona fide* alien seamen; and he was not 'a *bona fide* nonimmigrant'. No amount of sympathy for an alien who wishes to disassociate himself from a communistic regime in the country of his birth can furnish justification or excuse for disregarding the plain mandate of the statute."

See to like effect: *Duran-Garcia v. Neelly,* 246 *F. 2d* 287 (5 *Cir.* 1957); *Del Castillo v. Carr,* 100 *F. 2d* 338 (9 *Cir.* 1938); *Lukman v. Holland,* 149 *F. Supp.* 312 (*D. C. Pa.* 1957); *In re Chow's Petition,* 146 *F. Supp.* 487 (*D. C. N. Y.* 1956); *United States ex rel. Alexandrovich v. Commissioner of Immigration,* 13 *F. 2d* 943 (*D. C. N. Y.* 1925); *cf. Buscema v. Buscema,* 20 *N. J. Super.* 114 (*Ch. Div.* 1952).

Much argument is incorporated in Gosschalk's brief to the effect that he is and should be considered as a treaty trader. The Appellate Division refers to him as a "provisional treaty trader." No such status appears to be authorized in the statute. The act, section (a)(15)(E), defines a treaty trader to be:

"An alien entitled to enter the United States *under and in pursuance of the provisions of a treaty* of commerce and navigation between the United States and the foreign state of which he is a national, and the spouse and children of every such alien if accompanying or following to join him: * * * or (ii) solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital;". (Commonly called "treaty investors." *Besterman, supra, p.* 40.) (Emphasis added)

Assuming for the moment that plaintiff came here as a treaty trader (which, as will appear, was impossible), he would still occupy the position of a temporary visitor admitted for a period of time fixed by the admitting immigration officer. 8 *C. F. R.* § 214e.2. And he would have to establish that "He intends in good faith, and will be able, to

depart from the United States upon the termination of his status." 22 *C. F. R.* § 41.71. Or if the length of the stay was fixed in an existing treaty, such proviso would control even if it were for permanent residence. (*E. g., Treaty with Switzerland of November 25, 1850, procl. Nov. 9, 1855,* 11 *Stat.* 587, 588, *Art.* 1; or the 1880 treaty with China, 22 *Stat.* 826, which was later modified by statute. *Hing Lowe v. United States,* 230 *F. 2d* 664 (*9 Cir.* 1956).) Whatever the particular status with respect to duration, it would end if the treaty were terminated. 8 *C. F. R.* § 214*e.*4. See, generally, *Auerbach, Immigration Laws of The United States,* 136–138 (1955).

But when Gosschalk was admitted, there was no trade treaty between Holland and the United States in existence. There is none to this day and he could not possibly qualify as a treaty trader or investor.

In an effort to circumvent this incontrovertible fact, plaintiff adorns himself with the description of "provisional treaty trader." This straw comes from a notation appearing on his visa (which is specifically called "Visitor's Permit") as follows:

"Mr. Eddy Gosschalk would be eligible for a 3(6) visa *if the appropriate treaty between the United States and the Netherlands were in effect.* James A. Niederjohn. American Vice-Consul." (Emphasis added)

This gratuitous statement, not even made by a person who occupied the capacity of an "admitting officer" (see *Besterman, p.* 46), cannot make him a treaty trader. The fact is that the visa given classed him as a temporary visitor for business or pleasure. The vice-consul's note may have been of some influence with the immigration authorities in this country when the applications for extension of the six months stay were made. But, so far as the record shows, it could have no legal effect on his visitor's status. Certainly it cannot be deemed to wipe out his legal disability to establish a domicile in the United States. That disability was removed on October 16, 1953, when the condition he hoped for materialized and he became

a quota immigrant. Then he became invested with capacity to establish a domicile. But that date was less than two years before his divorce action was instituted. Consequently the court was without authority to act in the matter.

## II.

### DENIAL OF THE STAY.

Plaintiff and defendant, both Dutch nationals, were married in New York on July 24, 1947. Thereafter they were in and out of this country on visitors' visas until November 7, 1952, the date which is critical to this cause. In September 1952 Gosschalk was living in Weehawken, New Jersey. His wife, who had previously returned to Holland, joined him there pursuant to an understanding that they would go to Canada and endeavor to obtain admission to the United States as immigrants. That course was pursued but proved fruitless, and they came back to Weehawken, still bearers of visitors' visas only. On November 7, 1952 Mrs. Gosschalk again left for Holland. She claims that the departure was precipitated by his misconduct; he asserts that she deserted him.

On December 24, 1952, a little more than a month after reaching their home in Amsterdam, she sued for divorce on the ground of adultery and in the alternative for a separation "from table and board." As an incident, his property was attached and shortly thereafter she was granted maintenance *pendente lite* of approximately $200 per month in American dollars, which she is still receiving. Gosschalk entered a personal appearance in the action on May 7, 1953, and four months later applied for leave to file a counterclaim seeking a divorce on account of her alleged adultery, and in the alternative for a separation "from table and board." Permission was granted on December 16, 1953, but he delayed taking advantage of it until March 24, 1955, 15 months later. His wife answered the counterclaim on October 27, 1955, saying among other things:

"Petitioner further denies, with indignation, that she should ever have been guilty of any adultery (or of any indecent conduct of life; respondent avoids—and with good reason—mentioning any further specification). She states emphatically that her conduct of life has always been irreproachable; even now she does not receive men at home neither does she deal with or go out with other men, so that respondent's allegations are incomprehensible."

On October 16, 1953 the federal immigration authorities granted Gosschalk the immigration visa which authorized permanent residence here. As has been indicated, 13 months later he instituted this proceeding against his wife for divorce on the ground of desertion, alleging November 7, 1952 as the date of separation. Substituted service was employed. The complaint specifically referred to the suit pending in Holland and to the order for temporary alimony therein. In addition to the divorce judgment, a declaration was sought adjudging the maintenance order to be void in this State, as well as a restraint against the further prosecution of the foreign litigation. The complaint alleged also that Mrs. Gosschalk's foreign action was predicated upon a false assertion of domicile. In this connection, note may be taken of the fact that four months later Gosschalk filed his counter-claim in her suit in which he made no reference to the action here nor to the allegation therein that his wife's claim of Holland domicile was false. He sought no stay of her proceeding there and he did not pursue either *pendente lite* or at final hearing his prayer for restraint set out in the complaint in New Jersey.

Hearing of the domestic cause for divorce was listed for April 5, 1956. On that day, the wife's counsel moved for a stay pending the outcome of the earlier Holland controversy. After hearing some discussion about alleged procrastination in the prosecution thereof, but without making any specific finding that the wife had been guilty of undue delay, the court denied the motion, saying that it was addressed to his discretion and that:

"It seems to me that the court following its general practice is solicitous of its own calendar and is mindful that litigation should

be expeditiously handled with due respect to the other rights of the respective parties. I will deny the application to stay.

"The plaintiff may proceed."

In my judgment, that ruling was a mistaken exercise of discretion.

Comity between nations and states is one of the few courtly doctrines of the law. It is not an imperative matter; it does not signify absolute obligation. In the ordinary intercourse between the courts of nations at peace and between those of sister states, it springs from an abiding sense of courtesy between equals. It represents no impeachment of sovereignty, but only reciprocal regard for the authority and integrity of tribunals with concurrent jurisdiction to act in a given matter. It is a principle of persuasion based on practical convenience, expediency and good will. Concededly, its recognition in a given case is discretionary and not mandatory.

However, after years of experience in dealing with comity, the courts have given it a content by which the exercise of discretion in certain matters is to be guided. That content, forcefully pertinent here, teaches that one court should defer action on causes even though properly within its jurisdiction until courts of another sovereignty already cognizant of the litigation have had an opportunity to adjudicate the controversy. *Darr v. Burford*, 339 *U. S.* 200, 204, 70 *S. Ct.* 587, 94 *L. Ed.* 761 (1950).

In our own State the rule in action is said to mean that:

"Considerations of comity forbid interference with the prosecution of a proceeding in a foreign jurisdiction capable of affording adequate relief and doing complete justice, unless there be a special equity sufficient in conscience to stay the hand of the defendant. The question is not the existence of the power but the propriety of its exercise in the given case. The rule of comity is grounded in the policy of avoiding conflicts of jurisdiction, unless upon strong grounds, and the general principle that the court which first acquires jurisdiction of the issue has precedence." *O'Loughlin v. O'Loughlin*, 6 *N. J.* 170, 179 (1951).

I see no reason in conscience and equity why the earlier acquisition of adjudicatory power over the matrimonial con-

troversy should not be bowed to by our courts. These parties are Holland nationals. Both of them submitted their dispute voluntarily to a proper tribunal of their own sovereignty. That tribunal made an order for payment of maintenance *pandente lite* and the husband has been conforming to the direction of the order for more than five years. There is not the slightest indication that justice will not or cannot be done in Holland. And in my view it is unseemly for our court to ignore the forum first selected by the wife and accepted by the husband. Adherence to the general practice of being "solicitous of its own calendar" is not a sufficient special equity.

The contention advanced that the wife's delay in moving her suit in Holland warranted the trial court's ruling is insubstantial. Our own case took from November 23, 1954 to February 11, 1957 (complaint to judgment *nisi*). On the record presented to us, the term "delay" can be given no invidious implications. It can mean only the passage of time because there is not the slightest proof that the foreign action did not proceed under the circumstances of the case in accordance with the local and accepted practice, or that it did not reach the trial list there in the ordinary course. Any delay which would justify the visitation of unfavorable consequences upon the wife must be judged not by the mere lapse of time, nor by the standards of our own system, but on the basis of criteria which would be applied by the courts of the Netherlands. And in this connection it cannot escape attention that since 1953 the husband has been represented by counsel in Holland, and that he has been paying his wife $200 monthly all that time. If his wife had been guilty of improper delay gauged by local standards, would not a motion have been made to dismiss or to proceed? In any event, on the score of relative delay in prosecuting claim and counterclaim, is there much to choose between them? Certainly not enough to warrant our disregard of the applicable international amenity. Particu-

larly is this so when the certificate of the High Court of Justice dated March 23, 1955, recites, among other things:

"At the sitting of this Court, 6th Division, of March 24, next, this case will again—for the 19th time—*be called out for filing of a statement of defense by the respondent.*

Consequently, the aforesaid action Gosschalk v. Gosschalk * * * is still pending before this Court." (Emphasis added)

The absence of contest or complaint on either side with respect to the periods of time intervening between the various pleadings and in awaiting the appearance of the matter on the trial calendar, furnishes no clear indication of lack of diligence on the part of the wife. And it must be remembered that the burden of showing strong grounds justifying disregard of comity rests on the person resisting the plea for a stay.

Moreover, from the standpoint of comity, the special equities favor our abstention from the controversy. The record indicates that the husband thinks little of traveling back and forth across the ocean. He has business interests in Amsterdam and apparently in other parts of the world. As a national of Holland, undoubtedly he felt at home in its courts or he would not have filed his counterclaim there. He has never sought dismissal of his wife's suit or of the order for maintenance nor did he ever seek a stay. In fact, we were advised by the parties at oral argument that her case was partly heard while this trial was in progress, and that only recently they took some depositions in the United States in connection therewith. Of course, this fact was not before our trial court when the motion for stay was made. But wholly apart from any consideration of events subsequent to that motion, equity clearly pointed to the same denial of relief here as was ordered in *Stultz v. Stultz*, 15 *N. J.* 315 (1954). There, the husband and wife were married and lived in New Jersey for many years. After a long period of separation, the husband went to Florida and acquired a *bona fide* domicile there. Then he sued her for divorce in Florida and she retained counsel and entered a general

appearance to contest the action. Later, while he was visiting temporarily in New Jersey, she instituted suit for separate maintenance and to restrain him from pursuing his action in Florida. An injunction issued but it was set aside by this court, with the declaration that:

"Where there is a voluntary submission to the foreign jurisdiction there is no ground for intervention by the New Jersey courts, or rather there is no ground unless there be a special equity justifying such relief notwithstanding the appearance." (At *page* 319)

And see: *Fantony v. Fantony,* 21 *N. J.* 525, 533 (1956); *Prudential Ins. Co. of America v. Merritt-Chapman & Scott Corp.,* 112 *N. J. Eq.* 179 (*Ch.* 1933); *Bigelow v. Old Dominion Copper, etc., Co.,* 74 *N. J. Eq.* 457 (*Ch.* 1908); *Barber v. Barber,* 324 *P. 2d* 746 (*Cal. D. Ct. App.* 1958).

For these reasons, even if jurisdiction over the subject matter of the controversy did exist, I would reverse the denial of the stay and direct that this action be held in abeyance until our judicial confreres in Holland have a reasonable time within which to render judgment. There is no sound reason why we should impose upon the courts of a friendly nation the difficult task of deciding whether to honor or to ignore an intervening judgment of our court or to vacate or sustain their *pendente lite* support order or to grant or deny a final support order. *Cf. Vanderbilt v. Vanderbilt,* 354 *U. S.* 416, 77 *S. Ct.* 1360, 1 *L. Ed. 2d* 1456 (1957); *Estin v. Estin,* 334 *U. S.* 541, 68 *S. Ct.* 1213, 92 *L. Ed.* 1561 (1948).

Justices HEHER and PROCTOR have authorized me to say that they join in this dissent.

*For affirmance*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING and JACOBS—4.

*For reversal*—Justices HEHER, FRANCIS and PROCTOR—3.