### UNITED STATES v. NORTH GERMAN LLOYD S. S. CO.

### SAME v. INTERNATIONAL MERCANTILE MARINE CO.

(Circuit Court, S. D. New York. February 9, 1911.)

1. STATUTES (§ 263*)—CONSTRUCTION—RETROACTIVE OPERATION.

    Words in a statute ought not to receive a retroactive operation unless they are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the Legislature cannot be otherwise satisfied.

    [Ed. Note.—For other cases, see Statutes. Cent. Dig. § 344; Dec. Dig. § 263.*]

2. ALIENS (§ 40*)—DEPORTATION—COST—STATUTES—CONSTRUCTION—RETROACTIVE OPERATION.

    Immigration Act March 3, 1903, c. 1012, 32 Stat. 1213, prohibited entry of idiots, paupers, persons afflicted with certain contagious diseases, prostitutes, persons convicted of felony, and certain others. Section 2 declared that all aliens "brought" into the country "in violation of law" should be sent back on the vessels bringing them, and that the expense of their maintenance while on land as well as of their return should be borne by the owner of the vessels. Section 20 provided that any alien who should come into the United States "in violation of law" or who should thereafter "be found a public charge therein, from causes existing prior to landing," should be deported, at the expense of the person bringing the alien, or of the immigrant fund. The act of 1903 was repealed by Act Cong. Feb. 20, 1907, c. 1134, 34 Stat. 898 (U. S. Comp. St. Supp. 1909, p. 447), which added to the classes excluded "women or girls coming into the United States for the purpose of prostitution; or any other immoral purpose." Section 3 declared that any alien woman or girl who should be found an inmate of a house of prostitution, or practicing prostitution, at any time within three years after she shall have

entered the United States, should be deemed unlawfully within the United States and should be deported as provided in sections 20 and 21 of the act. Section 20 provided that any alien who should enter in violation of law or become a public charge from causes existing prior to landing should be deported at any time within three years, at the expense of the contractor, procurer, or other person by whom the alien was unlawfully induced to enter the United States. or, if that could not be done, the cost of removal to the port of deportation should be borne by the immigrant fund, and the deportation from such ports should be at the expense of the owner or owners of such vessels or transportation line by which the aliens respectively came. Section 21 provided that, in case the Secretary of Commerce and Labor should be satisfied that an alien had been found in the United States in violation of the act, he should cause such alien within the period of three years after landing to be taken into custody and returned to the country whence he came, as provided in section 20. etc. *Held,* that where an alien lawfully entitled to enter under the act of 1903, then in force. not being within one of the prohibited classes, arrived on February 14, 1905, and was arrested on July 29, 1910, and ordered deported as a person practicing prostitution in the United States. the steamship company by which she was brought to the United States was not liable under the act of 1907 for the cost of her deportation from the port of entry, since the provision of that act for deportation at the expense of the steamship companies should be construed as prospective and only applicable to aliens brought to the United States after its adoption, since if otherwise construed it would be unconstitutional as depriving such companies of their property without due process of law.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 100; Dec. Dig. § 40.*]

**3.** ALIENS (§ 40*)—EXPULSION OF IMMIGRANT—ALIEN PROSTITUTES—STATUTES —CONSTRUCTION.

Act Cong. March 26, 1910. c. 128, § 2, 36 Stat. 264, amending Immigration Act Feb. 20, 1907, c. 1134, § 3, 34 Stat. 899 (U. S. Comp. St. Supp. 1909, p. 450), by striking the time limit from the amended act, within which an alien prostitute might be deported in the manner provided by sections 20 and 21 of the act, authorized the subsequent deportation of such aliens at any time after entry when they were found practicing prostitution.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 100; Dec. Dig. § 40.*]

**4.** ALIENS (§ 40*)—POLICE POWER—SCOPE AND EXERCISE.

The provision of the immigration act declaring that an alien woman who subsequent to landing commits a specified offense shall be deported is a proper exercise of police power; but the provision that the cost of her deportation shall be imposed on another person who had nothing to do with the commission of such offense is not an exercise of such power.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 100; Dec. Dig. § 40.*]

Action by the United States of America against the North German Lloyd Steamship Company, and by the United States against the International Mercantile Marine Company, to recover the cost of deporting certain aliens who had arrived in the country on a vessel belonging to the defendants. On demurrer to the complaints. Sustained.

These two actions are brought to recover the passage money of certain alien women, who had been brought to this country by a vessel of one or other of the defendant companies. The Secretary of Commerce and Labor had in each instance ordered the deportation of the alien under the immigration acts and insisted that the deportation from the port of New York should be at the expense of the steamship line which brought her here. Defendants

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

having refused to transport on such terms, the government paid the passage money and now sues to recover the amount so paid. To each complaint demurrer has been interposed on the ground that such complaint does not state facts sufficient to constitute a cause of action. The cases of the several aliens are all alike. It will be sufficient to rehearse the facts in that of Aurelie Darlet.

Henry A. Wise, U. S. Atty.

Lucius H. Beers, for North German Lloyd S. S. Co.

Burlingham, Montgomery & Beecher, for International Mercantile Marine Co.

LACOMBE, Circuit Judge (after stating the facts as above). Defendant is a German corporation operating a trans-Atlantic line of steamers. The complaint avers that Aurelie Darlet is an alien, and that she arrived in this country on the Kronprinz Wilhelm of defendant's line on February 14, 1905. There is no averment that she came here on any one's procurement; or that she was within any one of the prohibited classes of immigrants; or that she was not a person of good moral character and entitled to enter; or that the steamship company violated any law or regulation in bringing her here. How old she was, then or now, nowhere appears. It is next averred that on July 29, 1910, more than five years after landing, she was "found an inmate of a house of prostitution and found to be practicing prostitution" at Oakland, Cal.; that she was taken into custody under a warrant of the Secretary of Commerce and Labor on the ground that she was unlawfully within the United States in violation of Immigration Act Feb. 20, 1907, c. 1134, 34 Stat. 898 (U. S. Comp. St. Supp. 1909, p. 447), as amended in 1910 (Act March 26, 1910, c. 128, 36 Stat. 263), and was thereafter ordered by the secretary to be deported and returned to the country whence she came at the expense of the steamship company importing her. Then follow the averments as to refusal of the defendant and payment of passage money by the government.

The immigration act in force when this woman came here was that of March 3, 1903 (chapter 1012, 32 Stat. 1213). It enumerated several classes of immigrants to whom entry was forbidden—idiots, paupers, persons afflicted with certain contagious diseases, prostitutes, persons convicted of felony, and others. Section 2. It contained various provisions for exacting penalties from any person or corporation violating the act. It further provided that:

"All aliens brought into this country in violation of law shall, if practicable be immediately sent back to the countries whence they came on the vessels bringing them. The cost of their maintenance while on land, as well as the expense of the return of such aliens, shall be borne by the owner or owners of the vessels on which they respectively came."

Refusal to receive them back on board and to return them to the foreign port from which they came is made a misdemeanor. Section 19. It further provided that any alien who "shall come into the United States in violation of law, or who shall be found a public charge therein, from causes existing prior to landing, shall be deported as hereinafter provided, to the country whence he came at any time within two years after arrival" at the expense of the person bringing such alien

into this country, or, if that cannot be done, then at the expense of the "immigrant fund." Section 20. The next section provided that in case the Secretary (of Commerce and Labor) shall be satisfied that an alien has been found in the United States in violation of this act he shall cause such alien, within the period of three years after landing, to be taken into custody and returned to the country whence he came, as provided in section 20, or, if that cannot be so done, at the expense of the immigrant fund. Neglect or refusal to take on board and return such alien ordered deported under this section shall be punished by the imposition of the penalties prescribed in the nineteenth section. Section 21.

This act, which was in force when Aurelie Darlet came here, was repealed by the act of February 20, 1907, which took effect July 1st of that year. Had the act of 1903 remained in force and unamended, no obligation to take on board and return her to the country whence she came would exist. She did not "come into the United States in violation of law," nor was she "found a public charge therein from causes existing prior to landing," nor was she "found in the United States in violation of this act (of 1903)." There would be no authority to deport her, and of course no question of using a vessel of the line that brought her for that purpose.

In place of the repealed act, there was substituted the immigration act of 1907. It made some changes in the enumeration of classes who were to be excluded from admission. It enumerates, besides "prostitutes," "women or girls coming into the United States for the purpose of prostitution or for any other immoral purpose." So far as the record here discloses, this alien woman on arrival did not come within any of these enumerated classes and could not have been refused admission had this act been in force when she came here.

Section 3 provides that:

"Any alien woman or girl who shall be found an inmate of a house of prostitution or practicing prostitution at any time within three years after she shall have entered the United States shall be deemed to be unlawfully within the United States and shall be deported as provided by sections 20 and 21 of this act."

Section 19 provides for immediately sending back all aliens brought into the country in violation of law on the vessels bringing them. It is substantially the same as section 19 of the old act.

Section 20 of the new act is the old section 20, somewhat amended. It provides that any alien who shall enter in violation of law and such as become public charges from causes existing prior to landing shall be taken into custody and deported at any time within three years after the date of entry. Such deportation shall be at the expense of contractor, procurer, or other person by whom the alien was unlawfully induced to enter the United States, or, if that cannot be done, the cost of removal to the port of deportation shall be borne by the immigrant fund "and the deportation from such port shall be at the expense of the owner or owners of such vessel or transportation line by which such aliens respectively came."

Section 21 of the new act is section 21 of the old act with the clause providing for a return at the expense of the immigrant fund stricken

185 F.—11

out. It is further amended so as to cover not only cases where the secretary is satisfied that an alien has been found in the United States in violation of this act, but also cases where he is satisfied "that an alien is subject to deportation under the provisions of this act or of any law of the United States."

On March 26, 1910, the second and third sections of this act were amended. No change material to this cause was made in section 2. The only material amendment of the third section is the striking out of the words "at any time within three years after she shall have entered the United States," thus making the section cover any alien who shall be found at any time "an inmate of a house of prostitution or practicing prostitution."

Two concessions are made at the outset of the argument. Defendants do not dispute the proposition that Congress has plenary power over aliens and may expel them from the country at any time and for any reason. It is therefore unnecessary to refer to the many authorities which sustain that proposition. The district attorney concedes that, so far as defendants are concerned, the act, if construed as plaintiff contends, would be retroactive, and that the rule of construction laid down in U. S. v. Heth is to be applied:

"Words in a statute ought not to have a retrospective operation unless they are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the Legislature cannot be otherwise satisfied." 3 Cranch, 399, 2 L. Ed. 479.

So far as the alien is concerned, the statute (section 3) as it stands amended is a drastic one. How far reaching it is may be best understood by supposing a not impossible case. An alien girl while yet a nursing infant comes to this country with her parents. None of them are within any of the excluded classes. They are received as desirable immigrants and prove themselves to be so. The parents better their condition as the years go by, but the father neglects to be naturalized. The child grows up under their care and guidance an estimable and virtuous girl. Then just as she reaches womanhood both parents die after some lingering illness which wastes away their little resources, and the young woman is left, it may be with no other relative, to make her struggle for existence as best she can. She may for some years more maintain herself, and then at last, in some time when work is scarce and poverty is strong, may take the easiest way to keep body and soul together, and, falling, may slip rapidly down to the condition denounced in the act, "practicing prostitution." All hope for her may not yet be lost. Institutions, state and local, and countless agencies maintained by the willing gifts of individuals stand ready to help the fallen woman and secure to her some opportunity of a new life. Can the alien fallen woman avail of this help? No, because the sovereign power stretches out its powerful arm, seizes her, and casts her out of the country, in which her young life was wrecked, to fling her into the country whence she came so many years before that to it she is practically an alien, possibly unable to articulate the simplest phrase in its language, penniless it may be, and alone. If such be the wages of sin for the alien fallen woman, the price might be thought higher

than that announced in Romans vi, 23. It is certainly startling to find such a piece of legislation upon the statute books of a Christian country. But it is there nevertheless.

The language of the third section is plain and imperative. The amendment of 1910 struck out the three-year limitation; it makes no difference how long after landing—20, 30, or 50 years—she is found offending. Nor is there any discretion left with the Secretary of Commerce and Labor. Section 21 says that he shall cause the alien's deportation in case he shall be satisfied that she is subject to deportation under the provisions of the act; but that means only that he shall be satisfied that the facts show that she has been actually found practicing prostitution; once this is shown, the statute imperatively provides that she "shall be deemed to be unlawfully within the United States," and that imperative mandate is as binding upon the secretary as it is upon any one else.

Section 3 provides that the alien "shall be deported in the manner provided by sections 20 and 21," and when the act was amended in 1910 the three-year clause was not struck out of these sections. It has been contended that for that reason the general provision for deportation at any time should be restricted to three years, although Congress expressly struck such limitation out of the third section. This argument was disposed of in U. S. ex rel. Brion v. Prentis (D. C.) 182 Fed. 894.

What is the situation so far as defendants are concerned? It is not thought that the amendment of 1910 affects the question. The provision in the act of 1907 (section 21) imposing the expense of deportation on the carrier when the alien is sent back for causes not existing at the time of arrival was a retroactive provision. If in December, 1907, when the act of that year was in force, and the alien had not been here three years, she had been "found" in violation of the act and ordered deported by one of defendants' steamers, the same question would be presented which is presented now. It will be simpler therefore to construe the two sections (20 and 21) without considering the amendment.

It may be noted that so far as the alien is concerned the statute is not retroactive. She is to be deported, not because of something which happened when she came here before the new statute was passed, but because she is guilty of wrong conduct in this country after it was passed: the statute reads "any alien * * * who shall be found." With that wrong conduct she herself is directly connected; with it defendant has no connection whatsoever. It may further be noted that the section providing for payment of the expense of deportation is not legislation distinctively affecting an alien. It happens in the actions at bar that both defendants are aliens, but that is a mere incident. The provisions as to expenses apply and were intended to apply to steamship owners who are citizens equally with steamship owners who are not.

The plaintiff construes the immigration act as providing that the expense of deporting an alien who at any time subsequent to landing—years afterwards—commits a certain specified offense here shall be imposed upon the common carrier who brought her to this country.

At the time she was brought here, our statutes and regulations had made and announced a careful and specific enumeration of the classes of persons who should be refused admission. The statutes and regulations also made provision for deporting certain classes of persons, but only such as had come here in violation of the excluding sections, or who had become a public charge from causes existing when the particular alien came. Such persons the common carrier was advised that it must take back at its own expense. In bringing the alien into this country the common carrier acted in scrupulous conformity to the provisions of these statutes and regulations, assuming the burden therein announced and no other. It is not surprising that defendants contend that subsequent legislation of this sort, if construed to operate retroactively, is unconstitutional on the ground that it takes their property without due process of law. A provision that an alien woman, who subsequent to landing may commit a specified offense, shall be deported, is an exercise of the police power; a provision that the cost of her deportation shall be imposed upon another person, who had nothing whatever to do with the commission of such offense, is not an exercise of such power.

This statute of 1907, however, as originally passed or as amended, is susceptible of a construction which gives full meaning to all its words and yet avoids this objection.

Although the act provides that all persons of the classes enumerated therein shall be returned to the country whence they came, and that they shall be so returned at the expense of the shipowner or transportation line which brought them here, it is manifest that Congress must have understood that this could not always be done. The particular shipowner might have gone out of business, bankrupt perhaps, years before deportation is ordered, his or its ships been sold, and at the time of deportation employed in commerce wholly between foreign ports; indeed, the very existence of such owner might have terminated by death or dissolution, so that it would be impossible to impose the expense of deportation upon the shipowner, although actual deportation is peremptorily ordered. No doubt Congress assumed that in such a case the executive officers would find some other fund or appropriation which would enable them to comply with its peremptory mandate. In the cases at bar there seems to have been no difficulty in finding the money with which to pay the passage of the deported aliens; such money was in fact paid, and the present actions are to recover it. Therefore the mere circumstance that the general language of the statute is qualified with no words of exception does not constrain us to the conclusion that Congress intended that there should be no exceptions.

Moreover, the clause imposing the expense of deportation upon the shipowner is not rendered inoperative by the proposed construction. No one disputes the proposition that the shipowner must carry back at its own expense the insane person, or the person afflicted with some contagious disease, or the prostitute, or the convict, etc., etc., although the most rigid inspection which it might avail of failed to disclose the situation when it brought them here. And there is the like obligation

in the case of a person found at any time after landing to be a public charge from causes existing prior to arrival. That was a risk which the carrier assumed when under the statute in force at the time it undertook to bring aliens into this country.

The new provisions under consideration do not really deal with the act of immigration, but with new offenses committed after the immigrant has become a denizen. It would be a not unreasonable construction to hold that the carrier, in no way forewarned of such new legislation, is not to be mulcted in consequence of it, when such carrier has strictly conformed his or its own conduct to the legislation in force when the alien was brought here; but that, in all cases where the carrier has brought aliens to this country subsequent to the enactment of the new statute, such transportation shall be at the carrier's risk—he or it must become an insurer that the alien woman will remain publicly chaste during the rest of her life, or at least as long as she remains here. If unwilling to assume such a risk, the carrier need not bring any alien woman here who will not first deposit with such carrier a sum sufficient to cover her return passage, in the event that through her own fault or her misfortune she may at some future time become liable to be deported.

Since this construction seems not unreasonable, and since the one contended for by plaintiff would probably leave part of the act obvious to constitutional objection, it would seem that, in the language of U. S. v. Heth, supra, "the intention of the Legislature (can) be satisfied" by holding these provisions not to be retroactive.

The demurrers are sustained.