### Ex parte MOREL.

(District Court, W. D. Washington, N. D. June 15, 1923.)

#### No. 7519.

1. **Aliens ☞53—Alien held not subject to deportation for "importing woman for immoral purpose."**

   Petitioner, a French alien, contracted a common-law marriage with a foreign woman in California by taking each other as husband and wife in the presence of friends, which was recognized as a legal marriage in France. Both parties acted in good faith and in the belief that the marriage was legal. They lived together in California and Washington for some 12 years, and then went to Canada, where petitioner had temporary employment. They remained there for more than a year, and then returned to Washington, where they continued to live together. During all this time they believed they were legally married, and while their marriage was invalid in California and Washington, it was valid in Canada. Petitioner bore an excellent reputation for morality among all who knew him. *Held,* that he was not subject to deportation, under Immigration Act 1917, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), for importing a person "for the purpose of prostitution or for any other immoral purpose."

2. **Aliens ☞54—Findings of commissioner, fully supported by evidence, that charges in deportation warrant are not sustained, should be accepted.**

   A finding by a Commissioner and Assistant Commissioner of Immigration, fully supported by the testimony of witnesses heard before them, that charges made in a deportation warrant are not sustained by any evidence, should be accepted as conclusive.

3. **Aliens ☞53—Statutory provision for deportation held to apply only to future acts.**

   The provision of Immigration Act 1917, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), authorizing deportation of any alien "who shall import ＊ ＊ ＊ any person for the purpose of prostitution or for any other immoral purpose," applies only to future acts.

4. **Aliens ☞54—Competency and legal admissibility of evidence to be considered in determining whether fair hearing was given in deportation proceeding.**

   It is the duty of a court to consider the competency and legal admissibility of the evidence presented in determining whether a fair hearing was given in deportation proceedings.

Habeas Corpus. In the matter of the petition of Leon Morel for a writ to secure relief from an order of deportation. Writ granted.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The petitioner, a master moulder in artistic bronze, a French alien, entered the United States at the port of New York in 1901, and shortly thereafter arrived in the state of California. While living in San Francisco he entered into a marriage contract with an Italian woman, which was consummated by cohabitation. The marriage ceremony consisted of a number of friends of both parties meeting, and the petitioner and the Italian woman proclaiming to those assembled that they had agreed to live together as husband and wife.

"Q. What sort of marriage ceremony took place? A. We had about 14 or 15 friends on each side one night in the home, and we just made ceremony between us and got married like that. Q. In other words, the marriage ceremony consisted only in your proclaiming to these guests present that you two had consented to live together as man and wife? A. Yes, sir. Q. Didn't you know at the time that the statutes of the state of California did not approve of common-law marriages? A. I did not know. Q. Who advised you to get married in that way? A. Nobody advised me, but I had this idea, because I saw that kind of marriage performed many times in France."

Thereafter the said parties lived together, cohabiting as husband and wife, and held each other out to the public as husband and wife; the woman taking the surname of the husband and being supported and maintained by him. On different occasions the parties joined as husband and wife in the execution of mortgages and conveyances of real property; both parties believing the marriage to be valid, and in good faith believing the ceremony was in accordance with the custom prevailing in France, where such a marriage is recognized as legal and binding. Morel had known and courted the woman for approximately six months prior to the marriage. She was a good, moral woman. The parties lived at San Francisco until 1905; then came to Seattle, where they lived together as husband and wife until 1913, when they went to Vancouver, B. C., where Morel was engaged to do some work in his line of business, and there lived as husband and wife. At the conclusion of the work, after some 13 months, they returned to Seattle in February, 1914; Morel preceding the woman a few days. He left funds with her to provide for her transportation, and on entering at the port of Blaine she represented herself as the wife of the petitioner, and they lived together as husband and wife in Seattle until they separated.

A business venture in which Morel had engaged proved unprofitable, and his judgment was criticized by the woman. At about this time the parties learned through some newspaper report that their marriage was not in accordance with the laws of California, where they had lived, nor of the state of Washington. Morel offered to marry the woman, but she declined, and they separated; he paying and delivering to her all of the funds and property which had been left after the business venture. They have not lived together since. Thereafter Morel married, in accordance with law, his present wife, with whom he is living and has one child.

Later Morel was arrested, charged with being unlawfully in the United States, first because he is an anarchist; second, because he imported a woman for immoral purposes; third, because he is likely to become a public charge. He was ordered deported. Several applications for rehearing were denied by the department. Upon the eve of his deportation the petitioner sued out a writ of habeas corpus in the Southern district of New York. This was determined against him upon the hearing, and was taken to the Circuit Court of Appeals, and the appeal was dismissed. 270 Fed. 577. The matter was then appealed to the Supreme Court of the United States, and on motion of the government was dismissed, for want of jurisdiction, in Morel v. Baker, 258 U. S. 606, 42 Sup. Ct. 315, 66 L. Ed. 786.

Petition was again presented to the department for rehearing on the ground of newly discovered evidence and the petition was granted. Thereafter further testimony was presented. While much of it is cumulative or amplification of the former testimony, there is much evidence, however, which places the testimony in a different light, and exposes the condition and relation pertaining to the issue in a different status and atmosphere. A number of witnesses, substantial citizens, testified with relation to earning capacity, and

the artistic development, and the proficiency of the defendant in his trade or profession, and of his earning capacity, and likewise of the moral character of the defendant, among which is the United States attorney, who testified in answer to questions:

"A. I made inquiries concerning his character and conduct and activities from the time of our recent war up to the last month, I will say. More particularly have I inquired as to his character and conduct through reputable men in this city, who knew him well at that time. In that way I made the investigation. Q. And what did you find as a result of your investigation? A. I found that his reputation was exceedingly good; that the men who seemed to know him well spoke in the highest terms of him as a good, peaceful, character. As United States attorney handling this case for the government, I made investigations of the two specific charges set forth in the warrant of arrest. One was that he had lived with a woman for quite a period without having been legally married to her. I ascertained that Morel had in his judgment married this woman in California, having gone through some kind of marriage, where there were some 20 or more friends present, and, as he stated to me, it was a kind of French method of marrying, and giving further explanation that that kind of marriage took place in France because of the length of time it required to get a real marriage through there, and that a great many French people were married in that way. But he was under the impression that he was legally married to this woman until within a recent time, probably two years or more—I don't know the exact date—at which time he discovered that it was not a valid marriage, spoke to her, and 'suggested they get married, but for some reason, probably not getting enough money, she demurred to that, and they separated as good friends. I further went into the question of what was known as philosophical anarchy; not knowing what it was myself, I was interested to find out what it meant. He said he became interested in that phase through some professor of high standing in France, and what he understood by it was that all men should so live in their relations one to another, under the principle established in the Golden Rule, that we would thereby need no laws to restrain men from doing wrong, and the country would be better off if men would so live. He admitted to me, however, that, while that was a mighty pretty theory, he himself would not like to be subjected to it in a country as a property owner and citizen; that he believed it was highly necessary to have a well-defined system of law to protect men in their personal and property rights and that he was for the law. Q. In your investigation of that marriage relationship did you find anything at all tainted with immoralty? A. I did not find that at all. I was really convinced that he had acted in perfect good faith, and had taken this woman to be his wife, and as far as I could find he had no thought of any immoral life, or living with her as a prostitute—that he took her for the purpose of making her his wife, and thought he had made her his wife. I had not at that time known there was such a custom at all in France, but ascertained afterwards there was such a custom prevailing in France."

Upon rehearing the Assistant Commissioner found, and this finding is concurred in by the Commissioner, that: "At no time has this alien been a public charge, nor does it appear that such a steady-working, industrious mechanic ever would become a public charge. In appearance he is a quiet unassuming workingman, who impresses one quite favorably. His education is limited, and he speaks the English language with some hesitation. He is married to an American-born woman, and they have one child born to them here in Seattle. He owns his own home, except for $400 mortgage against it. His employers and business associates all testify to his great ability as a mechanic, his industry, and his law-abiding qualities. Even the United States attorney, who had made a thorough investigation of the charges against the alien, testifies that he finds the charges unfounded, and expresses his belief that the man is a desirable citizen. * * * From the evidence in the record (both hearings) I find that Leon Morel is a native of France, and still is an alien, he never having completed his application for American citizenship; that he first entered the United States in 1901 at the port of New

York, and again in 1914, when returning from a year's residence in Vancouver, Canada, to which place he had gone temporarily to do some bronze work. I find, further, that the alien was not an anarchist at the time of his return to the United States in 1914, as charged in the warrant of arrest (July 18, 1918); * * * that he did not at the same time procure or attempt to procure or import a prostitute or person for the purpose of prostitution or other immoral purpose; or that he was at the time a person likely to become a public charge."

The Board of Review, in passing upon the report of the Commissioner and the Assistant Commissioner at Seattle, said: "Assistant Commissioner Monroe and Commissioner Weden of Seattle recommended cancellation of the warrant, but in the opinion of the Board of Review the evidence introduced is not germane, and did not overcome and tend to overcome, does not disprove or even tend to disprove, the charges contained in the warrant of deportation. * * * In the opinion of the Board of Review, the testimony introduced at the rehearing does not in any way disprove the charges in the warrant, and that the said warrant charges have been fully sustained. Therefore, by reason of the premises, it is recommended that the previous order of deportation be permitted to stand, and that the alien should be deported at the first available sailing." And thereupon the Second Assistant Secretary directed that the previous order stand and the alien be deported.

The discharge of the petitioner is sought on the ground that he did not have a fair trial, and that there is no evidence to warrant the order of deportation.

Burkheimer & Burkheimer, of Seattle, Wash., for petitioner.

Thomas P. Revelle, U. S. Atty., and John A. Frater, Asst. U. S. Atty., both of Seattle, Wash., for the United States.

NETERER, District Judge (after stating the facts as above). [1] This is a peculiar case. There is none like it in the books. The decision of the District Court of the Southern District of New York is not published. The per curiam decision of the Circuit Court of Appeals contains 90 words, aside from the citation of two cases. The case involves the welfare of three persons—one a child, a citizen of the United States, born since the court decisions; another the wife, born in the United States, never lived elsewhere, who lost her citizenship by marriage with the petitioner; and the petitioner, a resident of the United States for 22 years, less one year, when he left the United States to perform some special work in the city of Vancouver, B. C. There is no legal testimony in the record that the petitioner is an anarchist. There is attached a statement, purported to have been made by the petitioner, saying he was a philosophical anarchist. This statement was not shown to him.

There is nothing in the record that this is a correct statement of what he did say, and aside from his answers to the direct questions should not be considered. The party to whom this statement is alleged to have been made was not produced, did not testify, and, without the specific identification, the statement of the inspector that the statement would be attached, without specific identification and oath that it is correct, should not be considered, nor should the Roebas letter be considered. But for the consideration of the effect upon the life of the child and mother, the issue, while entitled to the same consideration, might not be approached with the same deliberation. I do not regard Morell v. Baker (C. C. A.) 270 Fed. 577, as conclusive here. The testimony to a limited degree may be cumulative, but considered in the light of

a revelation of truth I think may be considered as a whole in the elucidation of the true relation of the actors before the law bearing upon the charge against the petitioner and his belief in governmental institutions, and his regard for and loyalty to organized government, and especially that which is provided by the Constitution of the United States.

[2] Approaching this issue in the light of this testimony, I am convinced that the Acting Commissioner and Commissioner of Immigration were right in concluding that there is no testimony to show that the petitioner was an anarchist. They had the opportunity of observing the petitioner, to note his manner of testifying, his acts with relation to environment, disclosed under their view, and were in a position above that of any person connected with the consideration of this case, whose duty it was to examine, consider, and conclude upon the facts. A glance of a living witness, tone of voice, and manner of speaking sometimes conveys more in a minute with relation to the truthfulness of a statement than the reading of a volume could prove. The Commissioner and Acting Commissioner were in a position to say whether there was any evidence to sustain any of the charges, and, having found there is none, I think, in view of the situation here presented, this court is justified in saying that their conclusion should be final, and that in the light of the new testimony presented should supervene the statement of the Circuit Court of Appeals as to the former finding, that the woman was imported for immoral purposes.

The testimony is conclusive that the petitioner and the woman believed they were married; they had lived together under that belief. They had entered into the contractual relation, and assumed a social status. There is no evidence of any immoral or illicit purposes, or intimation of such purpose, in the entire record. The mere fact that the parties entered into a common-law marriage relation, not recognized by the state of California, where it was entered into, since 1895, of which the petitioner was ignorant, should not brand the act as criminal, or the conduct as immoral. There is nothing essentially or inherently immoral or vicious in the conduct of the parties, according to their own understanding and belief, and that of their friends who were present when the ceremony was performed. The criminal character of the cohabitation does not come from the fact of their cohabiting together as husband and wife, but only by reason of legislative enactment, and of this they were ignorant, and immorality of their conduct cannot be predicated upon such act. Temescal Rock Co. v. Ind. Accid. Com., 180 Cal. 637, 182 Pac. 448, 13 A. L. R. 683.

Sexual intercourse of the parties must be the motive and purpose of the importation, and where parties enter the United States upon the belief that they had a lawful right to sustain the relation of husband and wife they may not be regarded as within the provisions denounced by the Immigration Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 4289¼a–4289¼u) with relation to importation for immoral purposes, where there can be no question with relation to the good faith of the parties. Fisher v. U. S. (C. C. A.) 266 Fed. 667. The primary purpose of the act is to be protected against men and women who are

weak, vicious, and bad. The question under this act is not whether Morel and the woman were legally married, but the purpose of bringing the common-law wife from Vancouver to Seattle; and the record unquestionably shows that these parties each in good faith believed they were legally married, and, so believing, neither of them could have entertained any immoral purpose.

Whether the parties offended against the law of the state of Washington by cohabiting as man and wife without a legal marriage is a matter for the state (U. S. v. Sibray [C. C.] 178 Fed. 144), and has no relation to the Immigration Act. The parties having entered into a common-law marriage relation, consummated by cohabitation in California and Washington for a period of years before removing to British Columbia, as husband and wife, continuing the common-law marriage relation in that province, so living and cohabiting in the Dominion of Canada, the conduct ripened into a recognized legal common-law relation in Canada, at least. Robb v. Robb, 20 Ont. 591; Breakey v. Breakey, 2 U. C. Q. B. 349; Pelpit v. Cote Rap. Jud. Que. 20 C. S. 338; L. R. A. 1915E, note page 12. And being so recognized in Canada, the parties in good faith so believing, no presumption arises that the woman was brought into this country for the purpose of prostitution or other immoral purposes. Crime is not presumed, and the record in this case is devoid of any immoral purpose, or such intent, when the circumstances are considered with relation to the provisions of the Immigration Act. Gegiow v. Uhle, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114.

[3] It may also be said that Act Feb. 5, 1917, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), reading, "Any alien who shall import * * * any person for the purpose of prostitution or for any other immoral purpose," contains no language importing an intent to make this provision retroactive. The importation charged was three years prior to the enactment under which deportation is invoked. "Shall" may be ranged in two classes: (a) implying futurity; or (b) implying a mandate. The present use clearly has relation to future conduct.

" 'Words in a statute ought not to have a retrospective operation, unless they are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied.' U. S. v. Heth, 3 Cranch, 399, 2 L. Ed. 479; U. S. v. North German Lloyd S. S. Co. (C. C.) 185 Fed. 158, 162." U. S. v. Tsuji Suekichi, 199 Fed. 750, 118 C. C. A. 188 (9th Circuit).

The word "shall" in its common and ordinary usage, unless accompanied by qualifying words which show a contrary intent, always refers to the future. 35 Cyc. 145, and cases cited.

"In the early English, and hence in our English Bible, 'shall' is an auxiliary mainly used in all persons to express futurity." Webster.

It is manifest that denunciation by the act, supra, is as to conduct looking to the future, and it applies only to immigrant aliens, and not to resident aliens.

[4] Nor is there, as above stated, any legal evidence, when the fundamental principles that inhere in due process of law are considered (The Japanese Immigration Case [Yamataya v. Fisher] 189 U. S. 86, 23

Sup. Ct. 611, 47 L. Ed. 721), that the petitioner is an anarchist; and it is the duty of the court to consider the competency and legal admissibility of the evidence presented in determining whether a fair trial was given (Hanges v. Whitfield [D. C.] 209 Fed. 675; Ex parte Plastino [D. C.] 236 Fed. 295).

The charge that the petitioner was likely to become a public charge is without testimony and has apparently been abandoned. The writ is granted.