### UNITED STATES v. JHU WHY.

(District Court, N. D. Georgia. January 27, 1910.)

ALIENS (§ 32*)—DEPORTATION OF CHINESE—SUFFICIENCY OF EVIDENCE.

    A person of Chinese descent, claiming to have been born in the United States and to have never been out of this country, where he and other unimpeached witnesses testify to such fact without contradiction, and his good character and truthfulness are testified to by white persons of standing who have known him for years, cannot be ordered deported solely on testimony tending to show that he made false statements to an inspector, which is denied.

    [Ed. Note.—For other cases, see Aliens, Dec. Dig. § 32.*

    Citizenship of the Chinese, see notes to Gee Fook Sing v. United States, 1 C. C. A. 212; Lee Sing Far v. United States, 35 C. C. A. 332.]

Proceeding by the United States against Jhu Why. From an order of deportation by a commissioner, defendant appeals. Reversed.

E. A. Angier, Asst. U. S. Atty.

Charles D. Hill, Harvey Hill, and Moore & Branch, for defendant.

NEWMAN, District Judge. This is an appeal from the action of the United States commissioner in making an order of deportation of Jhu Why, under the Chinese exclusion act (Act April 29, 1902, c. 641, 32 Stat. 176) and the act amendatory thereof (Act April 27, 1904, c. 1630, § 5, 33 Stat. 428 [U. S. Comp. St. Supp. 1909, p. 473]). The question in the case is whether or not Jhu Why was born in the United States. If he was born in the United States of parents of Chinese descent, who at the time of his birth had a permanent domicile and residence in the United States and were there carrying on business, although at the time of his birth his parents were subjects of the Emperor of China, if the parents were not employed in any diplomatic or official capacity under the Emperor of China, such child became, at the time of its birth, a citizen of the United States by virtue of the first clause of the fourteenth amendment of the Constitution:

    "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state in which they reside."

And, this being true, the Chinese exclusion acts "do not and cannot apply to him." United States v. Wong Kim Ark, 169 U. S. 649, 18 Sup. Ct. 456, 42 L. Ed. 890.

The evidence here shows that Jhu Why was born September 9, 1882, at No. 10 Mott street, New York City. Jhu Why himself testifies that that is his understanding, and always has been, as to the time and place of his birth. He says that he was 2 years old when his father died, and 3 years old when his mother died, and he came under the care of an uncle, who lived in New York City. When he was 11 or 12 years of age he went to Albany, and stayed there 18 months or 2 years, and then came back to New York City, and was engaged in a business place of his uncle's on Mott street, New York City. He came to Atlanta about 8 years ago—that is, when he was about 20 years of age—and has been in Atlanta ever since.

Jhu Yet, a cousin of Jhu Why's, testified that he knew Jhu Why was born in New York at the time and place that Jhu Why states, that he saw him there and knew his father and mother, and in every way corroborated him.

The testimony of some Chinamen somewhat contradict this, but the principal reliance of the district attorney is upon the testimony of Mr. A. H. Saraphic, who was United States immigration inspector, but at the time Jhu Why was arrested was acting Chinese inspector. His testimony was to the effect that he found Jhu Why in Atlanta, and that Jhu Why first told him that he had no certificate, but afterwards told him that he had, but it was at some other laundry, but that he never produced any certificate. He was cross-examined as to whether he did not have Jhu Why mixed up with some other Chinamen, and particularly Lum Woo. Several Chinamen were in the courtroom at the time, and Mr. Saraphic seemed to know Jhu Why, though he said it was possible that before he so pointed him out he had looked around and asked some one which was Jhu Why. There was no doubt, however, that Mr. Saraphic really believed and was positive, after he looked at Jhu Why, that he was the man that he had arrested and with whom he had the conversation.

This is the important part of Mr. Saraphic's testimony, as taken from the stenographic report of the same:

"In view of the time that has passed, I may not remember exactly the details; but I have those things indelibly fixed in my mind. He told me that he was born in China, that he was a laundryman, and did not have his certificate. I believe he told me he had his paper in the laundry of another Chinaman, and after we started on the car to go there for the purpose of getting it to show it to me, and he saw I meant business and meant to go there, he told me that he did not have the certificate, and I think that he made the statement to me that he was smuggled over from Canada."

Mr. Saraphic was, of course, entirely sincere in what he stated, and seemed to be entirely fair in all his statements.

Jhu Why testified that Mr. Saraphic was mistaken, and he told him that he had no certificate, and that he was born in the United States. Five gentlemen of standing, one of them a minister of the gospel and pastor of a Presbyterian Church, were offered as witnesses by Jhu Why to establish his character. They testified to this, and nearly all of them had known him ever since he has been in Atlanta. Dr.

Holderby, the Presbyterian minister, has known him intimately ever since he has been in Atlanta, and so had some of the other witnesses. Dr. Holderby and two or three of the others testified that he told them, when he first came to Atlanta, that he was born in New York. This was objected to on the ground that it was a self-serving statement, and the right of the court to consider it is doubtful. The statements were made, however, apparently when Jhu Why was only 20 years of age, and before any effort had been made to deport him, and apparently without any reason for making the statements, except to tell the truth.

I am too doubtful of its admissibility for it to have any weight in my mind, however, and the case stands upon the testimony of Jhu Why and the relative who corroborated him as to the place of his birth, and the contradictory statements made by Mr. Saraphic in his testimony.

The case is very much like a case decided by the Circuit Court of Appeals for the Seventh Circuit. Moy Suey v. United States, 147 Fed. 697, 78 C. C. A. 85. In the opinion in that case, after stating the testimony of Moy Suey and of two relatives to the effect that he was born in New York, that he went from New York to Chicago, etc., giving some details, the court states:

"Against this the government has brought nothing, either to impeach the credibility of the witnesses, or disprove the probability of their narrative, except this: That, when first approached by the inspector, appellant refused to talk, further than to say that he was a native of the United States, but had forgotten the date and place of his birth. There is no testimony, for instance, throwing doubt upon the fact that there was a Chinese mercantile firm of the name stated; or of the fact that appellant attended the school named, or the Sunday school; or of the fact that the street and number named was the residence of Chinese 22 years ago, when appellant was born; or of the fact that the uncle and cousin lived where appellant stated they lived, and were engaged in the business that appellant stated they were engaged in; or of any other fact upon which appellant built his case of nativity. Indeed, upon the testimony presented, were the inquiry one respecting the descent of property, or something other than deportation dependent upon appellant's nativity, the testimony thus uncontradicted would be accepted by any court as the proven record truth.

"But the government claims, that under section 3 of the deportation act [Act May 5, 1892, c. 60, 27 Stat. 25 (U. S. Comp. St. 1901, p. 1320)] any Chinese person or person of Chinese descent shall be adjudged to be unlawfully within the United States unless such person shall establish, 'by affirmative proof, to the satisfaction of the judge or commissioner, his lawful right to remain in the United States,' and that this provision in some way nullifies the weight that would otherwise be given to the evidence referred to. Unquestionably Congress has power to exclude from our shores aliens of any birth, including the Chinese, and, having that power, has the power also to prescribe the conditions on which such exclusion shall be exercised. That the conditions prescribed may be hard would, in a judicial inquiry, be of no moment, for under the circumstances the question is not one of constitutional right, but of national policy. Fong Yue Ting v. U. S., 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905; The Japanese Immigrant Case, 189 U. S. 86, 23 Sup. Ct. 611, 47 L. Ed. 721. But when a person, physically and politically present in the United States at the time he is arrested for deportation, claims that he is an American-born citizen, and resists deportation on the basis of his rights of citizenship, the case is an entirely different one. Nativity gives citizenship, and is a right under the Constitution. It is a right that Congress would be without constitutional power to curtail or give away. It is a right to be adjudicated in the courts, in the usual and ordinary way of adjudicating constitutional rights. No rule of evidence may fritter it away. When such right is in court asking for protec-

tion of the law, no question of public policy can affect it. The citizen deported is banished, and banishment is a punishment that can follow only a judicial determination in due process of law. Black's Law Dictionary; 4 Blackstone Commentaries, 377. * * *

"But there is a fundamental distinction between the case of a citizen of the country who has left the country and is asking to re-enter it and a citizen of the country who has never left it, but whom the government is asking to deport; and while it is true, now that the Supreme Court has so decided, that the political power of the government may say whether a citizen of the country who has gone away shall be allowed to return or not, it seems to us uncontrovertable that a citizen of the country who has not gone out may not be deported or banished until the right of the government to deport or banish has been judicially determined. And, approached from this point of view, the case made out by appellant entitles him to a reversal of the order of the District Court. The order of the District Court, affirming the order for the deportation of appellant, is reversed, and the cause remanded, with instructions to discharge the appellant."

In the case of Pang Sho Yin v. U. S., 154 Fed. 660, 83 C. C. A. 484, decided by the Circuit Court for the Sixth Circuit, the headnote is as follows:

"Evidence considered, and held sufficient to entitle a Chinese person arrested for being unlawfully within the United States to his discharge on the ground that he was a citizen of the United States by birth; there being direct testimony of apparently credible witnesses to such fact, and no evidence to the contrary, except a statement made by defendant to the inspector who arrested him, which, although somewhat inconsistent with such claim, was not irreconcilable therewith."

In both the Cases of Moy Suey and Pang Sho Yin the Circuit Court of Appeals for the respective circuits reversed the action of the commissioner and of the District Courts in ordering deportation. I think these two cases are conclusive of the matter here. They are by Circuit Courts of Appeal, and, while there are a number of cases in which it was held that, upon the evidence, it was the duty of the court to order deportation, the two cases referred to are more like this case than any others I have found. The testimony of Jhu Why and his cousin, Jhu Yet, is only contradicted in any material way, as I have stated, by Mr. Saraphic's recollection of what Jhu Why stated to him. Jhu Why is not impeached in any way, nor is his relative; on the contrary, Jhu Why's general character, and particularly his character for truthfulness, is sustained by several witnesses, all of them well-known gentlemen in Atlanta, and of the highest standing.

I am unable to agree with the action of the commissioner in ordering Jhu Why to be deported, and he may be discharged.