### UNITED STATES v. CHARLIE DART.

(District Court, N. D. Georgia. April 5, 1918.)

1. ALIENS ⊕⇒32(5)—PROCEEDINGS FOR DEPORTATION OF CHINESE—BURDEN OF PROOF.

Where, in Chinese deportation proceedings, defendant claims to be a natural-born citizen and never to have left the United States, he is entitled to rely on his constitutional right to remain, and the burden is on the government to prove noncitizenship.

2. ALIENS ⊕⇒32(8)—DEPORTATION OF CHINESE—PROOF OF NONCITIZENSHIP.

A person of Chinese descent, claiming to have been born in the United States and to have never been out of this country, which fact is testified

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to by himself and other unimpeached witnesses without contradiction, and where his good character and truthfulness are testified to by white persons of standing, who have known him for years, cannot be ordered deported.

On review of order of commissioner for the deportation of Charlie Dart as a Chinese alien. Reversed.

J. W. Henley and W. Paul Carpenter, Asst. U. S. Attys., both of Atlanta, Ga.

Hugh Howell, of Atlanta, Ga., for defendant.

NEWMAN, District Judge. This is a question as to whether Charlie Dart, a Chinaman, should be deported from the United States; he being charged with violation of the Chinese Exclusion Act (Act May 5, 1892, c. 60, 27 Stat. 25 [Comp. St. 1916, §§ 4315–4323]). This man was taken before Commissioner Cornett, at Athens, Ga., and his finding on the subject is as follows:

"A complaint, verified by the oath of John Worden, a United States official, to wit, an immigration inspector, having been filed before me, the undersigned United States commissioner, charging the said Charlie Dart with a violation of the act of Congress of the United States entitled "An act to prohibit the coming of Chinese persons into the United States," approved May 5, 1892, and of the acts amendatory thereof, and a warrant for the arrest of the said Charlie Dart having been issued by me thereon, and the said Charlie Dart having been duly apprehended upon said warrant and brought before me for hearing at Athens, Ga., upon said charge (the United States attorney for said district having duly designated me as United States commissioner before whom said Charlie Dart should be taken for hearing), and the said Charlie Dart having been duly informed by me of the charge against him and of his right to the aid of counsel, and on the 13th day of July, 1916, the said Charlie Dart being present in person, and also being represented by his attorney, Hugh Howell, Esq., of Atlanta, Ga., and W. Paul Carpenter, Esq., Assistant United States Attorney, appearing for the United States, this cause came on regularly for hearing, and the same having been duly heard and submitted, and due consideration having been thereof had, I do find as follows:

"That the said Charlie Dart was found within the limits of the United States, to wit, at Madison, in the county of Morgan, in the Eastern division of the Northern district of Georgia on the 24th day of June, 1916, and that when he was so found, as aforesaid, he was without the certificate of residence required by the said act and amendments, and he had not clearly established that by reason of accident, sickness, or other unavoidable cause he has been unable to procure the said certificate.

"I do further find that the said Charlie Dart is by race, language, and color a Chinese person, a laborer by occupation, and that the said Charlie Dart has failed to establish by affirmative proof to my satisfaction his lawful right to remain in the United States, and that he has not made it appear to me that he is citizen or subject of any other country than China, and I find and adjudge the said Charlie Dart to be unlawfully within the United States.

"Now, therefore, in consideration of the premises aforesaid, it is ordered, adjudged, and decreed that the said Charlie Dart be deported from the United States to the country from whence he came, to wit, China, and that he, the said Charlie Dart, be hereby committed to the custody of the marshal of the Northern district of Georgia, to carry this order into effect."

This was signed by Commissioner Cornett, at Athens, Ga., with a photograph of Charlie Dart attached.

The real question in this case is whether Charlie Dart was born in the United States. He claims that he was born in San Francisco, Cal., on Sacramento street, 31 years ago in 1916, making him about 33 years old now, and claims to have remained in San Francisco until he was 11 years old, when he went with his father to Los Angeles, Cal., and stayed in Los Angeles, according to his claim, and his witnesses, 6 or 7 years, and then went with Low Hing, who is a witness for him here, to Chicago. According to the evidence, his father died before he left Los Angeles, and he states where his father was buried, in the Old Mission Cemetery in Los Angeles; and it seems that his mother had left his father when he was a little boy, according to the evidence, and was not with them or with his father when he died. Dart came from Chicago to Montgomery, Ala., and from there, according to the testimony, to La Grange, Ga., and from there to Carrollton, Ga., and then to Madison, Ga., where he was at the time of his arrest, and where he now lives.

It is unnecessary to go very thoroughly into the evidence but he has established clearly, if Chinese testimony is to be believed, that he was a little boy when one of his witnesses, who was a Chinaman, first knew him, and that was on Dupont street, in San Francisco, and he went with him to Los Angeles, and then to Chicago, and afterwards saw him in Montgomery and elsewhere. This man was arrested by Immigration Inspector John K. Worden, in Madison, Ga., on June 24, 1916, by reason of an anonymous letter received by the Immigration Department, stating that Charlie Dart had come into the United States from Mexico 3 years previously. He says that Dart told him, when he arrested him, that he was 26 years old, and that he was born at 837 Dupont street, San Francisco, Cal. He did not know whether he was born there or not, but he took his statements to be false. He said that Dart spoke English very well, and told him that he had been lots of places, but did not name them. This evidence by Mr. Worden was the only testimony offered by the government in the case. It relied upon its contention that Dart held the affirmative in the case, and it was incumbent upon him to satisfy the commissioner, by affirmative evidence, of his right to remain in the United States.

It is incontrovertible that the information given the inspector about Dart having come to this country from Mexico 3 years ago was untrue, for he proved by a number of witnesses, besides his Chinese witnesses, that he had been in this country longer than that. He proved by J. T. Rutland, who testified that he had lived in La Grange all of his life, except 4 years, that he had known Dart in La Grange 6½ years before the hearing before the commissioner, that he was in a laundry near his father's place of business, and then he went to the A. & M. School at Carrollton, and knew Charlie Dart there, and recognized him before the commissioner as the person he had known and known well in La Grange and in Carrollton.

He also proved by D. L. Hearn, of Carrollton, Ga., that he had known Charlie Dart since the first of 1913; knew him in Carrollton, where he was with Charlie Fong in the Ideal Laundry; that Charlie Dart stayed in Carrollton about 2 years, and he saw him every day,

two or three times a day; that he was engaged in an establishment which furnished the steam for the laundry in which Dart worked. He says he knows his reputation in Carrollton, and that it was good, and that he would believe him on oath. He only knew that Dart came from La Grange to Carrollton from what he told him.

He also proved by J. F. Stovall, the postmaster at Madison, Ga., that Charlie Dart was in the laundry business there, that he knew him, and that "Charlie was one of the best Chinese he ever knew, if not the best; he is a man of good character and reputation; attends to his business."

Harry Loo, a witness for Dart, was shown a letter, and said that he had seen the letter that Mr. Worden, the inspector, had exhibited, and that it was in the handwriting of Sam Long, another Chinaman, who was running a laundry in Dalton at the time of the hearing, and had run a laundry in Bleckley, Ga., at one time, and also at Manchester, Ga., at one time. This testimony, it is claimed by counsel for the defendant, taken in connection with certain testimony that Sam Long was indebted to Charlie Dart, showed that Sam Long had a motive for writing the letter produced by the inspector, and did write this letter.

Low Hing was the main witness for Charlie Dart, and testified that he had known him ever since he was a little boy. He stated where he first met him, and how he knew him, and all about his father's death, and all the circumstances connected with the various trips they took together. This witness was subjected to severe cross-examination, and yet stood by his story. His evidence sounds like the truth, and he is not impeached in any way.

Harry Loo, another Chinaman, who was born in this country, and lives in Atlanta, testified that he had known Charlie Dart over 2 years, and that he knew him while he lived in Carrollton. Loo testified that he was himself born in San Francisco, on Sacramento street, and this street, he says, is about two streets below Washington, and, if I understand it, Dupont street runs across it. The testimony is this:

"I was born in San Francisco, on Sacramento street, which is about two streets down below Washington, crossing Dupont; Sacramento, Clay, and Washington all cross Dupont."

Then he says he is 31 years old, and that he lived at that place 11 years, and that it is in China Town; thus locating, as I understand it (outside of his knowledge of Dart for the 2 years previously), the fact that Dupont street was near where he had lived and was in China Town.

[1] The real question which will dispose of this case is whether or not the defendant, Dart, holds the affirmative here, and must himself show to the satisfaction of the court, or the commissioner before whom he is heard, that he was born in this country and not subject to deportation. This question has been before the courts several times and the decisions are not entirely reconcilable. The Circuit Court of Appeals for this circuit had the question before it in the case of Gee Cue Beng v. United States, 184 Fed. 383, 106 C. C. A. 493, and the court there held that, where a Chinaman claimed to have been born in this country,

398    251 FEDERAL REPORTER

section 3 of the act of Congress of May 5, 1892 (27 Stat. 25), did not apply. That provision is as follows:

"That any Chinese person or person of Chinese descent arrested under the provisions of this act or the acts·hereby extended shall be adjudged to be unlawfully within the United States unless such person shall establish, by affirmative proof, to the satisfaction of such justice, judge, or commissioner, his ·lawful right to remain in the United States."

It was held as follows:

"Where in Chinese deportation proceedings defendant claims to be a natural-born citizen, never to have left the United States, he was entitled to rely on his constitutional right to remain, and the burden was on the government to prove noncitizenship."

The court then cites the decision of the Circuit Court of Appeals for the Seventh Circuit, in Moy Suey v. United States, 147 Fed. 697, 78· C. C. A. 85, and quotes from it as follows:

"But the government claims that, under section 3 of the deportation act, any Chinese person or person of Chinese descent shall be adjudged to be unlawfully within the United States, unless such person shall establish 'by affirmative proof, to the satisfaction of the judge or commissioner his lawful right to remain in the United States,' and that this provision in some· way nullifies the weight that would otherwise be given to the evidence referred to. Unquestionably Congress has power to exclude from our shores aliens· of any birth, including the Chinese, and, having that power, has the power also to prescribe the conditions on which such exclusion shall be exercised. That the conditions prescribed may be hard would in a judicial inquiry be· of no moment, for under such circumstances the question is not one of constitutional right, but of national policy. Fong Yue Ting v. U. S., 149 U.·S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905; Japanese Immigrant Case, 189 U. S. 86, 23 Sup. Ct. 611, 47 L. Ed. 721. But when a person physically and politically .present in the United States at the time he is arrested for deportation claims that he is an American-born citizen, and resists deportation on the basis of his rights of citizenship, the case is an entirely different one. Nativity gives citizenship, and is a right under the Constitution. It is a right that Congress would be without constitutional power to curtail or give away. It is a right to be adjudicated in the courts in the usual and ordinary way of adjudicating constitutional rights. No rule of evidence may fritter it away. When such right is in court asking for the protection of the law, no question of public policy can affect it. The citizen deported is banished, and banishment is a punishment that can follow only a judicial determination in due process of law. Black's Law Dictionary; 4 Blackstone Commentaries, 377. True, it was held in United States v. Sing Tuck, 194 U. S. 161, 24 Sup. Ct. 621, 48 L. Ed. 917, that a person asserting his right to enter the country on the ground that he is a citizen is not entitled to a writ of habeas corpus in the absence of an appeal to the Secretary of the Treasury from the order of the· Inspector denying his entry; and subsequently (United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040) that even after such appeal to the Secretary of the Treasury, and a denial of his right to enter, a person whose· right to enter the United States is questioned under the immigration law may not obtain entry by writ of habeas corpus, even though the right claimed is in virtue of American citizenship; a very vigorous dissenting opinion by Justices Brewer and Peckham having been filed in the latter case. These· cases proceed upon the principle that the person applying for the writ is not within the United States, but is seeking to enter or re-enter, and that, as against such right of entry or re-entry, the government constitutionally may make the political department the final judges. But there is a fundamental. distinction between the case of a citizen of the country who has left the country and is asking to re-enter it and a citizen of the country who has never left.

it, but whom the government is asking to deport; and while it is true now that the Supreme Court has so decided that the political power of the government may say whether a citizen of the country who has gone away shall be allowed to return or not, it seems to us incontrovertible that a citizen of the country, who has not gone out, may not be deported or banished until the right of government to deport or banish has been judicially determined. And, approached from this point of view, the case made out by appellant entitles him to a reversal of the order of the District Court."

In the opinion the court also refers to Pang Sho Yin v. United States, 154 Fed. 660, 83 C. C. A. 484.

In the case of Moy Suey v. United States, supra, the first headnote is as follows:

"A resident of the United States claiming to be a native-born citizen, although of the Chinese race, may not be deported or banished until the right of the government to deport or banish has been judicially determined in accordance with the usual and ordinary rules of evidence."

The language of the court, in the opinion by Circuit Judge Grosscup, is given above in the quotation by the Circuit Court of Appeals for this circuit.

Counsel for the government here, in a well-prepared brief, cites a number of authorities which are not in entire accord with the decisions to which I have referred; but inasmuch as the decision in the Gee Cue Beng Case is by the Circuit Court of Appeals for this circuit, and was rendered after all of the decisions cited on behalf of the government had been rendered, I am disposed to follow it, especially as it is supported by the decisions of other able Circuit Courts of Appeal.

[2] I had this same question before me in the case of United States v. Jhu Why (D. C.) 175 Fed. 630, and I quoted then from the Moy Suey Case, supra, as well as from the Case of Pang Cho Yin, and I held that:

"A person of Chinese descent, claiming to have been born in the United States and to have never been out of this country, where he and other unimpeached witnesses testify to such fact without contradiction, and his good character and truthfulness are testified to by white persons of standing who have known him for years, cannot be ordered deported solely on testimony tending to show that he made false statements to an inspector, which is denied."

I am perfectly satisfied that the inspector was wrongly informed to the effect that Dart had come, 3 years before he was arrested, from Mexico. His English and his appearance controvert that very clearly, as well as the evidence to which I have referred, showing unquestionably that he has been in the United States longer than that.

I am satisfied, from the authorities I have cited, that the government is wrong in its contention that this man, in a case like this, where he claims to have been born in the United States, must show, by affirmative evidence, his right to remain. And even if it were correct in that, with the evidence in the case before me, I should be unwilling to make an order for his deportation.

Being of the opinion, and I so find under the evidence which has been submitted in this case, that Charlie Dart is not subject to deporta-

tion, the action of the commissioner ordering his deportation is reversed, and it is further ordered that he be discharged, and the case against him dismissed.